**In re D.E.M., Appellee.**

**Appeal of Commonwealth of Pennsylvania.**

Superior Court of Pennsylvania.

Argued Sept. 15, 1998.

Filed March 18, 1999

Iva C. Dougherty, Asst. Dist. Atty., Reading, for Com., Appellant.

David R. Eshelman, Reading, for appellee.

Before KELLY, EAKIN, and OLSZEWSKI, JJ.

KELLY, J.:

¶ 1 In this appeal, the Commonwealth asks us to determine whether school officials act as agents of the police, where school officials conduct an investigation after being informed by police that a student may have a gun on school property. The Commonwealth also asks us to decide whether school officials must possess reasonable suspicion, supported by specific and articulable facts, before school officials can detain and question a student about an anonymous rumor that the student possesses a gun on school premises. Finally, the Commonwealth asks us to decide whether school officials must furnish a student with *Miranda*[1] warnings before questioning the student about conduct that violates both the law and school rules.

¶ 2 We hold that school officials do not act as agents of the police where they conduct an independent investigation based upon information the officials received from police. We also hold that school officials do not need reasonable suspicion, supported by specific and articulable facts, before merely detaining and questioning a student about a rumor concerning his possession of a gun on school property.[2] Finally, we hold that school offi-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Our holding is limited to situations where school officials do not act at the behest of law enforcement officers.

cials need not provide *Miranda* warnings to a student before questioning the student about conduct that violates the law and/or school rules. Accordingly, we reverse the order of the suppression court, which granted D.E.M.'s omnibus pre-trial motion to suppress physical evidence and remand for trial.

¶ 3 The relevant facts and procedural history of this appeal are as follows. On April 8, 1997, a police officer from the Shillington Borough Police Department ("officer") informed the principal and assistant principal of the Governor Mifflin Middle School of an anonymous tip that one of the students possessed a gun on school property. When the principal asked if the officer knew the name of the student, the officer identified D.E.M. The principal told the officer that he would investigate the rumor and contact him if the investigation turned anything up.[3] The officer then left the school's premises. Once the officer departed, D.E.M. was removed from class and brought to the principal's office. At this time, the principal asked D.E.M. if he had anything on his person or in his pockets which was against school rules.[4] D.E.M. said that he did not. The principal then asked D.E.M. if he would mind disclosing the contents of his book-bag. D.E.M. emptied the bag onto the principal's desk. The exposed contents of the bag did not contain any item in violation of school rules.

¶ 4 Thereafter, the principal requested D.E.M.'s consent to a search of his person. D.E.M became noticeably agitated and scared. After the principal informed D.E.M. that the school was concerned about information it had received, D.E.M. agreed to empty his pockets. One pocket contained a sheathed knife, which the principal confiscat-

ed. The principal then asked D.E.M. if he had a gun in school. D.E.M. admitted that he did and stated that it was in the pocket of his jacket, which was located in the locker of another student, P.Q. The principal sent for P.Q., who was escorted to his locker. P.Q. unlocked the locker by using the correct combination on the combination dial of the lock. The principal removed D.E.M.'s jacket, which contained a loaded gun in one of the pockets. In accordance with Governor Mifflin Middle School's behavioral code, school officials contacted the Shillington Borough Police Department and turned both the gun and knife over to the police.[5]

¶ 5 D.E.M. was arrested and charged with possession of a weapon on school property,[6] carrying a firearm without a license,[7] possession of a firearm by a minor,[8] and altering or obliterating marks of identification.[9] On April 28, 1997, D.E.M. filed an omnibus pre-trial motion to suppress the physical evidence obtained following the school officials' investigation. A suppression hearing was held on May 2, 1997. Subsequently, the suppression court found that the principal and assistant principal acted as "agents" of the police during their investigation because the police supplied information to the school officials with the intent of instigating an investigation. As such, the suppression court held that the school officials lacked the necessary reasonable suspicion to support their investigative detention of D.E.M and granted D.E.M.'s motion. The Commonwealth filed this timely appeal and certified that the suppression order in question substantially handicapped the prosecution of D.E.M.[10]

---

3. Governor Mifflin Middle School has an established policy to investigate all rumors concerning anything that may jeopardize the health, safety, or welfare of the students and faculty. (*See* N.T., 5/2/97, at 13; R.R. at R19).

4. At the beginning of each school year, students receive a copy of Governor Mifflin Middle School's behavior code. The behavior code specifically prohibits the possession of knives and/or firearms on school property.

5. We note that state law requires school officials to report the discovery of any firearm to local law enforcement officials. *See* 24 P.S. § 13-1318.

6. 18 Pa.C.S.A. § 912(a)(b).

7. 18 Pa.C.S.A. § 6106(a).

8. 18 Pa.C.S.A. § 6110.1.

9. 18 Pa.C.S.A. § 6117(a).

10. *See Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985) (holding Commonwealth's appeal from suppression order is proper when Commonwealth certifies in good faith that suppression order substantially handicaps prosecution).

¶ 6 On appeal, the Commonwealth raises the following issues:

1. WHETHER THE [SUPPRESSION] COURT ERRED IN RULING THAT THE JUVENILE HAD STANDING TO CHALLENGE THE SEARCH OF A LOCKER BELONGING TO A THIRD PARTY?

2. WHETHER THE [SUPPRESSION] COURT ERRED IN CONCLUDING THAT THE SCHOOL OFFICIALS ACTED AS AGENTS OF THE PO-LICE?

3. WHETHER THE [SUPPRESSION] COURT ERRED IN SUPPRESSING THE EVIDENCE PURSUANT TO *COMMONWEALTH V. HAWKINS* AND *COMMONWEALTH V. KUE* WHEN NEITHER OF THOSE CASES PRECLUDE FURTHER IN-VESTIGATION AFTER AN ANON-YMOUS TIP?

4. WHETHER THE [SUPPRESSION] COURT ERRED IN SUPPRESSING THE EVIDENCE WHEN THE SCHOOL OFFICIALS HAD REA-SONABLE SUSPICION TO CON-DUCT THE SEARCH?

5. WHETHER THE [SUPPRESSION] COURT ERRED IN SUPPRESSING THE EVIDENCE WHEN THE SEARCH WAS CONDUCTED IN FULL COMPLIANCE WITH THE RULES WHICH WERE ESTAB-LISHED BY THE SCHOOL AND WHICH WERE KNOWN TO AND THEREBY AGREED TO BY THE JUVENILE AND HIS PARENTS?

6. WHETHER THE [SUPPRESSION] COURT ERRED IN SUPPRESSING THE EVIDENCE WHEN THE JU-VENILE VOLUNTARILY TURNED OVER THE KNIFE AND VOLUN-TARILY CONSENTED TO THE SEARCH OF HIS JACKET WHICH PRODUCED THE GUN?

(Commonwealth's Brief at 5).

¶ 7 On appeal from the grant of a defendant's motion to suppress, this Court applies the following standard of review:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts....

*Commonwealth v. Nester*, 551 Pa. 157, 160, 709 A.2d 879, 880–881 (1998) (citations omitted). *Accord Commonwealth v. Henderson*, 444 Pa.Super. 170, 663 A.2d 728 (1995) (*en banc*).

¶ 8 The Commonwealth asserts that the suppression court erred in concluding that the principal and assistant principal acted as agents of the police when they detained D.E.M. and searched P.Q.'s locker. The suppression court found that the police supplied information to the school officials with the intent to instigate an investigation. The suppression court therefore treated the interrogation and search by school officials as police conduct, and held that the investigative detention of D.E.M. was not supported by reasonable suspicion. Therefore, the suppression court held that the detention and search violated the Fourth Amendment. We disagree.

¶ 9 The resolution of whether school officials act as agents of the police is determined by an examination of the totality of the circumstances. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564, 595 (1971); *see also People in Interest of P.E.A.*, 754 P.2d 382, 385 (Colo.1988). Our analysis must include a consideration of (1) the purpose of the search; (2) the party who initiated the search; and (3) whether the police acquiesced in the search or ratified it. *Commonwealth v. Ellis*, 415 Pa.Super. 220, 608 A.2d 1090, 1091 (1992), *appeal denied*, 533 Pa. 623, 620 A.2d 489 (1993) (citing *Commonwealth v. Cieri*, 346 Pa.Super. 77, 499 A.2d 317, 321 (1985)). The mere fact that school

officials cooperate with police, however, does not establish that the police acquiesced in or ratified the search. *See Commonwealth v. Corley*, 507 Pa. 540, 547, 491 A.2d 829, 832 (1985) (mere use by police and prosecutors of results of search does not serve to ratify those actions as conduct of police). The inquiry must focus on whether the police coerce, dominate or direct the actions of school officials. *See United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir.1996) (citing *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir.1989)).

¶ 10 In the instant case, police relayed an anonymous tip to school officials that a student possessed a gun on school property. The possession of a firearm on school premises poses a serious threat not only to the school's educational environment, but also to the safety and welfare of the students and faculty. To address this kind of threat, Governor Mifflin Middle School had implemented a policy, which requires school officials to investigate all rumors about anything that jeopardizes the safety and welfare of the students and faculty. Hence, the school officials conducted the investigation principally to execute their duty to ensure the safety and welfare of the students for whom they are responsible. *See Ellis, supra*, 608 A.2d at 1091–1092 (stating where hospital personnel take blood for their own reasons and then freely volunteer the results to police, hospital personnel do not act as agents of the police); *People v. Dilworth*, 169 Ill.2d 195, 214 Ill.Dec. 456, 661 N.E.2d 310, 317–318 (1996) (holding where school liaison police officer conducts search in furtherance of school's attempt to maintain proper educational environment, liaison officer does not act as police agent). *See also United States v. Jennings*, 653 F.2d 107 (4th Cir.1981) (holding airline security do not act as agents of police where federal drug agents relayed

anonymous tip and were present when drugs were discovered because airlines have own reasons for conducting search).

¶ 11 Moreover, the police did not request or in any way participate in the school officials' investigation. In fact, the police were not even on school property when the school officials conducted their investigation. Thus, the record contains no evidence that the police coerced, dominated, or directed the actions of the school officials. Accordingly, we conclude that the principal and assistant principal did not act as agents of the police.[11] *See P.E.A., supra* (holding principal does not act as agent of police where police did not request or participate in search, even though police supplied information to principal with intent to instigate search); *Washington v. McKinnon*, 88 Wash.2d 75, 558 P.2d 781 (1977) (holding school official does not act as agent of police where police relayed anonymous tip to school official with intent to instigate search if police did not direct or suggest that student be searched); *Cason v. Cook*, 810 F.2d 188 (8th Cir.1987) (holding school official is not agent of police where police were present during school official's investigation); *Martens v. District No. 220*, 620 F.Supp. 29 (N.D.Ill. 1985) (holding school official does not act as agent of police where police did not participate in investigation and did not direct school officials to detain and search student); *Cass, supra* (implicitly holding school officials do not act as agents of police where school officials initiate investigation and enlist aid of police to conduct school wide locker search).

¶ 12 We must now decide whether school officials need reasonable suspicion before they can detain and question a student about a rumor that the student possesses a gun on school property. D.E.M. asserts that *Terry v. Ohio's*[12] reasonable suspicion standard, which governs police "investigative stops,"

---

11. We are mindful that school officials are agents of the state and therefore subject to the Fourth Amendment's protection against unreasonable searches and seizures. *See New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720, 729 (1985). Thus, our inquiry is not whether the school officials acted as agents of the state, but whether the school officials acted as agents of the police. This inquiry is necessary because the legality of a search conducted by school officials is measured by a lower standard than a search conducted by law enforcement officers. *See generally Id.; Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998); *Commonwealth v. J.B.*, 719 A.2d 1058 (Pa.Super.1998).

12. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

applies to stops conducted by school officials. D.E.M. therefore argues that the school officials did not have the reasonable suspicion necessary to detain and question him about his possession of a gun on school property because the school officials' information was based on an anonymous tip.[13] Thus, D.E.M. complains that the evidence discovered after his initial detention must be suppressed as fruit of the poisonous tree. The Commonwealth, however, claims that it makes no sense to begin a Fourth Amendment inquiry involving a search conducted by school officials with the question of whether a valid stop has occurred. The Commonwealth asserts that *Terry's* reasonable suspicion standard, used to examine police "investigative stops," is inapplicable to the detention and questioning of students by school officials. Instead, the Commonwealth argues that teachers must immediately address rumors concerning the possession of weapons on school premises to ensure the safety of the students for whom they are responsible. We agree.

¶ 13 The United States Supreme Court has held that the Fourth Amendment's prohibition of unreasonable searches and seizures applies to searches of students conducted by public school officials.[14] *New Jersey v. T.L.O., supra* at 333, 105 S.Ct. at 738, 83 L.Ed.2d at 729; *see also Cass, supra* at 33–35, 709 A.2d at 354; *J.B., supra* at 1061; *In the Interest of S.F.*, 414 Pa.Super. 529, 607 A.2d 793, 794 (1992); *In the Interest of Dumas*, 357 Pa.Super. 294, 515 A.2d 984, 985 (1986). The *T.L.O.* Court recognized that a balance must be struck between the school-child's legitimate expectations of privacy and the school's substantial interest in maintaining a safe and educational environment on school grounds. *T.L.O., supra* at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733. In balancing these competing interests, the Court concluded that school officials need neither a warrant nor probable cause to conduct a search of a student on school property. *Id.* at 340–341, 105 S.Ct. at 742–743, 83 L.Ed.2d at 733–734. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.*

¶ 14 The United States Supreme Court established a two-part test to assess the reasonableness of a school search conducted by school officials:

Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. 1868, 20 L.Ed.2d 889, 44 Ohio Ops 2d [O.O.2d] 383; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–342, 105 S.Ct. at 742–743, 83 L.Ed.2d at 734–735 (footnotes omitted); *see also Cass, supra* at 33–35, 709 A.2d at 354; *J.B., supra* at 1061. Applying this standard, the *T.L.O.* Court held that the search of a

---

13. The reasonable suspicion standard has been interpreted to preclude a police "investigatory stop" on the basis of an uncorroborated anonymous tip. *See Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997); *Commonwealth v. Hawkins*, 547 Pa. 652 692 A.2d 1068 (1997); *Commonwealth v. Kue*, 547 Pa. 668, 692 A.2d 1076 (1997).

14. In so holding, the Supreme Court laid to rest the concept *of in loco parentis* as the justification for a school official's search of a student. The Court stated: "Today's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies. In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the state, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment." *T.L.O., supra* at 336–337, 105 S.Ct. at 740, 83 L.Ed.2d at 731.

student's purse was reasonable, given that a teacher had reported seeing the student smoking in the lavatory in violation of school rules. *T.L.O. supra.*

¶ 15 Unlike *T.L.O.*, the challenge in the instant case is to the initial detention and questioning of D.E.M.[15] Thus, unlike *T.L.O.*, our inquiry is not whether a search of D.E.M.'s person or effects was reasonable, but whether in all the circumstances of this in-school encounter, D.E.M.'s right to personal security was violated by an unreasonable seizure of his person.

■ ¶ 16 The United States Supreme Court stated in *Terry v. Ohio* :

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, *unless by clear and unquestionable authority of law. Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000 [1001], 35 L.Ed. 734, 737 (1891).
>
> We have recently held that "the Fourth Amendment protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507 [511], 19 L.Ed.2d 576, 582 (1967), and wherever an individual may harbor a reasonable "expectation of privacy," *id.*, at 361 [88 S.Ct. at 516], 19 L.Ed.2d at 588 (Mr. Justice Harlan, concurring), he is entitled to be free from unreasonable governmental intrusion. Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437 [1446], 4 L.Ed.2d 1669, 1680 (1960).

*Terry, supra* at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898–899 (emphasis added). To assess the reasonableness of the school officials' conduct, it is necessary to first focus upon the state interest, which allegedly justifies official intrusion upon the constitutionally protected interests of the student. *Id.* at 20–21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. We must then balance the need to search against the invasion which the search or seizure entails. *Id.* (quoting *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

■ ¶ 17 We turn now to the state interest, which allegedly justifies the detention and questioning of a student by school officials. The Supreme Court has recognized that school officials have a substantial interest in maintaining a safe and educational environment on school grounds. *T.L.O., supra* at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733.

> Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. *See generally* 1 NIE, U.S. Dept. of Health, Education and Welfare, Violent Schools—Safe Schools: The Safe School Study Report to Congress (1978). Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Goss v. Lopez,* 419 U.S., at 580, 95 S.Ct. 729, 42 L.Ed.2d 725. Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship. *See id.*, at 582–583, 95 S.Ct. 729, 42 L.Ed.2d 725; *Ingraham v. Wright,* 430 U.S., at 680–682, 97 S.Ct. 1401, 51 L.Ed.2d 711.

*Id. See generally Cass, supra; J.B., supra; S.F., supra; Dumas, supra; In re Patrick Y.,* 124 Md.App. 604, 723 A.2d 523 (1999). Swift and informal disciplinary procedures are needed in our schools to enable school

---

**15.** Although *T.L.O.* held that school officials need reasonable suspicion before conducting a search of a student or his possessions, the Court did not address the standard by which to measure the more limited intrusion that occurs when school officials detain and question a student.

officials to perform their duty to maintain a safe and educational environment. *T.L.O., supra* at 340, 105 S.Ct. at 742, 83 L.Ed.2d at 733.

■ ¶ 18 Against a school's substantial interest in maintaining a safe and educational environment on school grounds, we must weigh the intrusion on D.E.M.'s right to control his person, free from interference of others, while in the school environment.[16] *See Terry, supra.* In his concurring opinion in *T.L.O.*, Justice Powell stated:

> In any realistic sense, students within the school environment have a lesser expectation of privacy than members of the population generally. They spend the school hours in close association with each other, both in the classroom and during recreation periods. The students in a particular class often know each other and their teachers quite well. Of necessity, teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child. It is simply unrealistic to think that students have the same subjective expectation of privacy as the population generally.

*T.L.O., supra* at 348, 105 S.Ct. at 746, 83 L.Ed.2d at 739 (Justice Powell concurring). In Pennsylvania, a student's right to control his or her person during school hours is limited by statute. Students are compelled to attend school and to remain there during school hours. *See* 24 P.S. § 13–1327. Students who fail to comply with their duty to attend school are subject to discipline by school officials.[17] In fact, Pennsylvania law empowers school officials to appoint school attendance officers whose duty it is to arrest students who fail to attend school. *See* 24 P.S. § 13–1341. Furthermore, students are required to comply with the rules governing schools, which includes submitting to teachers' and school officials' authority. *See* 24 P.S. § 13–1317. Thus, unlike the ordinary citizen on the street, a student's control over his or her person during school hours is limited by the unquestionable authority of law. *See Terry, supra.*

■ ¶ 19 Balancing D.E.M.'s limited right to control his person while in school, with the need of the school to maintain order and a proper educational environment, we conclude that the mere detention and questioning of D.E.M. by school officials was reasonable. The limited scope of the intrusion on D.E.M.'s right to control his person while in school is outweighed by the school officials' substantial interest in ensuring the safety and personal security of the student body for whom they are responsible. To require teachers and school officials to have reasonable suspicion before merely questioning a student would destroy the informality of the student teacher relationship, which the United States Supreme Court has respected and preserved.[18] *See T.L.O., supra* at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733. Instead, teachers and school officials would be forced to conduct surveillance, traditionally a law enforcement function, before questioning a student about conduct which poses a serious threat to the safety of the students for whom they are responsible. Thus, we hold that *Terry's* reasonable suspicion standard is inapplicable to the detention and questioning of a student by school officials.[19] *See W.J.S. v.*

**16.** Although the *T.L.O.* Court held that a student has a limited expectation of privacy in his or her possessions while on school grounds, the Court did not address a student's right to control his or her person during school hours.

**17.** Pennsylvania law also imposes penal sanctions upon every parent, guardian, or person in parental relation of a school age child who fails to secure the attendance of a child. *See* 24 P.S. § 13–1333.

**18.** The level of suspicion necessary to justify a search is directly related to the scope of the government's intrusion on an individual's rights. *See Terry, supra.* In the context of the school environment, school officials are only required to have reasonable suspicion before conducting a search of a student's person or possessions. *T.L.O., supra.* Certainly, the mere detention and questioning of a student constitutes a more limited intrusion than a search of his person and effects. Thus, we think it makes no sense to require the same level of suspicion to justify the school officials' actions in each situation.

**19.** We further note that *Terry's* requirement that police have reasonable suspicion, supported by specific and articulable facts, before conducting an "investigative stop" is designed to protect the citizen on the street from intrusions by police "whose judgment is necessarily colored by their

*Florida*, 409 So.2d 1209 (Fla.Dist.Ct.App. 1982) (holding criminal law standards for "investigative stop" are inapplicable to the mere detention and questioning of a student by school officials); *People v. Pruitt*, 278 Ill. App.3d 194, 214 Ill.Dec. 974, 662 N.E.2d 540 (1996) (holding anonymous tip from student that defendant was carrying gun justified initial intrusion of taking defendant out of classroom for questioning by school officials); *In re Alexander B.*, 220 Cal.App.3d 1572, 270 Cal.Rptr. 342 (1990) (stating that school authorities search of student was reasonable even where officials did not know name of student who provided tip that defendant had gun on school property).

■■■■ ¶ 20 The Commonwealth also argues that the trial court erred in finding that the school officials were required to furnish *Miranda* warnings before questioning D.E.M. about his possession of a gun on school property. Pennsylvania law makes clear that *Miranda* rights do not attach, and warnings are not required, when school authorities detain and question a student about conduct that violates school rules. *In re S.K.*, 436 Pa.Super. 370, 647 A.2d 952, 955 n. 3 (1994); *see also New Jersey v. Biancamano*, 284 N.J.Super. 654, 666 A.2d 199 (App. Div.1995) (holding *Miranda* rights do not apply where school officials detain and question student about unlawful conduct even if environment is coercive); *In re Corey L.*, 203 Cal.App.3d 1020, 250 Cal.Rptr. 359 (1988) (holding *Miranda* inapplicable where school officials question student about violations of law or school rules). Hence, we conclude that school officials do not need to provide a student with *Miranda* warnings before questioning the student about conduct that violates the law or school rules.[20]

**Conclusion**

¶ 21 In summary, we hold that the school officials did not act as agents of the police because (1) the purpose of the search and seizure was primarily to ensure the safety of the students for whom the school officials' are responsible; and (2) police did not coerce, dominate, or direct the school officials' actions. We also hold that the school officials' conduct was reasonable under the circumstances, and therefore did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. Finally, we hold that the school officials were not required to provide D.E.M. *Miranda* warnings before questioning him. Accordingly, we reverse the order of the trial court, which granted D.E.M.'s suppression motion and remand for trial.

¶ 22 Order reversed; case remanded for trial; jurisdiction is relinquished.

primary involvement in 'the often competitive enterprise of ferreting out crime.' " *Terry, supra* at 11–12, 88 S.Ct. at 1875, 20 L.Ed.2d at 900. This concern, however, is not present in the school environment:

Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils. Instead, there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education. *T.L.O., supra* at 349–350, 105 S.Ct. at 746, 83 L.Ed.2d at 740 (Justice Powell concurring). Thus, the policy served by *Terry's* reasonable suspicion standard does not apply to the detention and questioning of a student by school officials.

20. Due to our disposition of these issues, we need not address the Commonwealth's first and fifth issues raised on appeal. D.E.M.'s admission that he had a gun in P.Q.'s locker provided the school officials with reasonable suspicion to search the locker.