TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-00-00422-CV







In the Matter of V. P.








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. J-19,162, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING







 On February 16, 2000, appellant V.P., then fourteen years old, hid a gun in a friend's
backpack during the bus ride to his middle school. When they arrived at school, he retrieved the gun
and asked M.M. to hold it for him. The friend in whose backpack the gun was hidden approached
Lance Cox, the Austin Independent School District Police Officer assigned to the school, and told
Cox that V.P. had a gun on campus. Cox and Ira Williams, the school's hall monitor, excused V.P.
from his class and brought him to speak to Vince Trevino, an assistant principal. V.P. eventually
told Trevino where the gun was, and Cox arrested him. V.P. was adjudicated delinquent for the
offense of bringing a weapon into a prohibited place and was placed on probation for fourteen
months, to be served at a treatment facility in Corsicana. Tex. Penal Code Ann. § 46.03(a)(1) (West
Supp. 2001). He appeals in two points of error, arguing the district court erred in refusing to
suppress his oral confession and the gun. We will affirm.


Factual Background V.P. testified that he brought the gun, which did not work, to school because he was
afraid that a group of bullies who had been harassing him would jump him. He testified that when
he got to school he retrieved the gun from his friend's backpack and put it in his own backpack. He
asked another friend, M.M., to hold the gun for him because he did not want to be caught with it in
his possession. The boys went into a restroom, V.P. gave M.M. the gun, and the boys returned to
their classes. Williams and Cox then got V.P. out of class and said they had heard he had brought
"something illegal" onto campus. V.P. denied knowing anything, and Cox frisked him. Cox and
Williams walked V.P. to Trevino's office, where the adults questioned him; Cox left the office
during the questioning. V.P. testified that he denied having the gun and asked to talk to his mother
and his lawyer as soon as he was asked about it. He said he told the adults his lawyer's name and
said they could contact his sister and reach his lawyer and mother through her. V.P. said he first
denied knowing about the gun, but then admitted having brought it to school and given it to M.M. 
Trevino radioed Cox to report that M.M. had the gun, and V.P. and Williams went to M.M.'s
classroom; V.P. said Cox and Trevino followed behind them. V.P. told M.M. that the adults knew
about the gun and to "just give it up." M.M. walked back to the principal's office with V.P.,
Williams, Cox, and Trevino and gave the gun to the adults. Cox then handcuffed V.P. and took him
to Cox's office, where Cox read V.P. his rights and asked him to fill in some papers and sign his
name. Cox took V.P.'s photograph and fingerprints and drove him to Gardner-Betts Juvenile Center. 
V.P. did not try to leave Trevino's office at any point. He said he did not think he could leave
"because [he] was in a serious situation." 

 Cox testified that the girl in whose backpack V.P. had originally hidden the gun
approached Cox just before classes started and told him V.P. had brought a gun to school. She
described the gun and said it had been hidden in her backpack on the way to school. Cox believed
her, so he and Williams got V.P. out of class. Cox asked V.P. if he had anything he was not
supposed to have, and V.P. said no. Cox asked if he could search V.P., and V.P. consented. He said
they then walked V.P. to Trevino's office. (1) The adults asked V.P. about the gun, and V.P. denied
it and "got somewhat defensive." About three or four minutes after he walked V.P. to Trevino's
office, Cox left to look elsewhere for the gun. While searching the halls and restrooms, he saw
Williams walking M.M. towards Trevino's office, so he returned with them. Once the gun was
located, Cox brought V.P. to his office, read him his rights from a written warning form, and had him
read and sign the warning and a waiver on the bottom of the form. Cox then called V.P.'s mother
to tell her about the situation and to ask her to come to the school.

 When asked if V.P. was free to leave the campus before the gun was found, Cox
answered,


Was he free to leave? At that point, we didn't have a weapon. All we had was these
kids saying there was a weapon. In my mind, these kids were-they were trustworthy. 
These are kids I see every day. These girls were visibly upset. I believed that there
was a weapon on campus. [V.P.] was, to my knowledge, never instructed not to
leave. You know, you have to stay here until we are finished. At the same time, I
don't believe it was ever said that you can get up and walk out.


Although he believed that the girl who reported the gun was credible, he did not think her statement
that V.P. had a gun on campus was by itself enough to give him probable cause to detain V.P. or
M.M. Cox was not present for most of Trevino's questioning and did not know whether V.P. asked
to speak with his lawyer and mother. Cox was wearing his police uniform that day.

 Williams testified similarly to Cox. He and Cox were approached by three female
students shortly before classes began, and one of the students said V.P. had brought a gun onto
campus. Williams notified Trevino and then went with Cox to get V.P. from his class. V.P. came
into the hallway with them, and Cox asked if V.P. had anything at school he was not allowed to
have. V.P. replied no, and Cox asked if he could search him. V.P. agreed, and Cox did a quick pat-down search. Cox, Williams, and V.P. then walked to Trevino's office. Cox soon left the office,
leaving Trevino and Williams with V.P. For fifteen or twenty minutes, while Williams and Trevino
questioned V.P. about the gun, V.P. denied being involved in anything. Williams said he and
Trevino "asked for [V.P.'s] help to solve this situation, due to the seriousness of it and the safety of
the other students at school." V.P. finally said the gun did not work and told them M.M. had it. V.P.
and Williams called M.M. out of class and walked him to Trevino's office. Cox was speaking to a
janitor in the hallway outside of M.M.'s class when Williams and V.P. went there. Williams said
Cox kept his distance and "was in a supervisory role and . . . monitoring [Williams's] safety." M.M.
told the adults where the gun was, and Williams retrieved it. Williams then called Cox on the school
radio and to report that he had the gun. Asked whether V.P. was free to leave Trevino's office or
the campus before the gun was found, Williams answered, "No student is free to leave the campus. 
We have a closed campus during school hours."

 Williams said he briefly left Trevino's office once while V.P. was being questioned. 
When asked whether V.P. was read his rights before he was questioned, Williams said, "School
policy doesn't require me to [read a student his rights] in my job description." Williams said Cox
was not in Trevino's office while V.P. was questioned and denied that Cox asked him to question
V.P. because Cox could not do so without reading V.P. his rights. Williams said the school's policy
allowed him to talk to students and search their backpacks. He said if he found drugs or other illegal
items, "then it is turned over to Officer Cox, who handles the legal aspect of it. At that point it is
just an administrative process." He said Cox's role at the school is to act as a deterrent for illegal
activity and to enforce the law in the event of a crime. Williams's duties concern the safety of the
students, faculty, and facilities.

 Trevino testified that Williams approached him on the morning of February 16 to say
that V.P. might have a weapon at school. Trevino asked Williams to bring V.P. to the office so they
"could begin interviewing him and questioning him" about the gun. Trevino said when V.P. was
brought to Trevino's office, Cox only stayed for three or five minutes. Cox did not brief Trevino
on how to conduct the questioning. After Cox left, Trevino and V.P. continued talking about the
gun. Williams was present for most of the thirty or forty minutes Trevino was questioning V.P. 
Trevino stopped questioning V.P. for about five minutes while Williams left to address another
situation in the school. He did not attempt to contact V.P.'s mother until after V.P. admitted
bringing the gun to school. He did not read V.P. his rights, nor did he hear Cox or Williams do so. 
Trevino said:



My primary concern was to find a weapon. I felt initially that there was a strong
possibility there was a weapon on campus. I did not know for sure until [V.P.]
answered a few questions that led me to believe there was one. . . . Now the situation
was I do now know there is one on campus . . . . I guess because of the current
situations involving other things that are going on, we had just established a crisis
management plan, what to do in case of these situations. It was a manner of alerting
staff and taking action on how do we proceed, do we start locking down. We were
in what is referred to as a time crunch. We were approaching changing bells,
changing classes within a matter of a few minutes. Whatever chance we may have
had of keeping that student and that weapon in that place we were going to lose if we
moved 1200 students and trying to make a decision whether we move them or not. 
Yes, we were in a hurry to try to convince him that we needed to find that weapon,
and we found it. It was turned over to us, I think, about 10, 12 minutes before classes
changed.



 Trevino told V.P. that it would be better for V.P. if he turned over the gun than if
someone got hurt with it. He said during the conversation, V.P. seemed to become more willing to
turn over the gun. Trevino said he and Williams never raised their voices while they talked to V.P. 
Trevino knew V.P. had recently lost his father, and he "asked [V.P.] if he felt that his dad would
want him to turn the weapon over to us. Shortly after that, he began to tell us that he had given it
to [M.M.]." V.P. cried and became emotional when they talked about his father. 

 When asked why Cox left the interview, Trevino said:


Officer Cox was in my office. [V.P.], when I was asking him about the weapon, he
would look at Officer Cox and he would make--you made a statement I didn't want
to go to jail, but his focus was more on Officer Cox than myself, even though I was
asking the question. We just, I guess, sensed that he was more concerned with
Officer Cox being in the room than myself. And working together for four years, we
just, you know, looked at each other and kind of just knew intuitively that Officer
Cox's presence there was not good and possibly [V.P.] would not cooperate. So
Officer Cox left and that's when [V.P.'s] dialog began to change and become
cooperative. I guess we were right in our assessment.



He believed "that [V.P.] felt that he would not be able to have just a complete, honest dialog with
. . . a law enforcement officer present." Trevino explained Cox's role at the school as follows:


[T]he school administration usually initiates the investigation of allegations and then
Officer Cox is brought in for advice or when the determination is made that it is now
a legal matter. We have several occasions where individuals are given to me as
suspects for drug possession, things of this sort, and it is not until after possibly that
I find the drugs or the individual admits to having drugs, then do I turn them over to
Officer Cox. It is not out of the ordinary that he is not involved in the initial
investigation of it, no.



Discussion

 In his first point of error, V.P. contends he was in custody from the moment he
stepped into the hall and was searched by Cox. V.P. argues that Trevino was an agent of the State
and seems to suggest that Trevino specifically acted as Cox's agent during the questioning. 
Therefore, V.P. argues, Trevino violated V.P.'s rights by not ceasing questioning when V.P. asked
to speak to his lawyer, his confession and the gun were inadmissible, and the trial court erred in
overruling his motion to suppress.

 A trial court's ruling on a motion to suppress will only be set aside on a showing of
an abuse of discretion. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). In a
hearing on a motion to suppress evidence, the trial court, as the trier of fact, determines the weight
and credibility to be given a witness's testimony. Id. at 138. When reviewing a trial court's
evidentiary rulings, we give almost total deference to the court's determination of the historical facts
and "mixed questions of law and fact" that apply the law to the case's specific facts and turn on an
evaluation of witness credibility and demeanor. In re L.M., 993 S.W.2d 276, 286 (Tex.
App.--Austin 1999, pet. denied). We review de novo mixed questions that do not require such an
evaluation. Id. Because there is no disagreement in this case about the facts, we will review de novo
the district court's determination that appellant was not in custody when he was questioned in
Trevino's office. Id.

 A minor has the same constitutional privilege against self-incrimination as does an
adult. Id. at 287. Someone taken into custody for questioning must be informed that anything he
says may be used against him in court and of his rights to remain silent and to have an attorney
present during questioning. (2) Miranda v. Arizona, 384 U.S. 436, 467-70 (1966). Therefore, if a
minor is in custody and asks to speak to his lawyer before or during questioning, questioning must
stop until an attorney is present. Fare v. Michael C., 442 U.S. 707, 717-18 (1979). However,
Miranda rights only apply to persons subject to custodial interrogation, defined as "the questioning
by law-enforcement officers after a person has been taken into custody or otherwise has been
deprived of his freedom in a significant way." In re L.M., 993 S.W.2d at 286-87 (citing Cannon v.
State, 691 S.W.2d 664, 671 (Tex. Crim. App. 1985)).

 In determining whether a minor was in custody at the time of questioning, courts
consider the age of the defendant and all the circumstances surrounding the interrogation to decide
whether there was a formal arrest or a restraint of movement to the degree associated with formal
arrest. Id. at 287, 289. In other words, courts ask whether, based on the objective circumstances,
a reasonable child of the same age would believe his or her freedom of movement was significantly
restricted. Id. at 289. Factors relevant to the question of whether a child was in custody include
whether there was probable cause to arrest, the focus of the investigation, the officer's subjective
intent, and the child's subjective beliefs. Jeffley v. State, 38 S.W.3d 847, 855 (Tex. App.--Houston
[14th Dist.] 2001, no pet. h.); see also In re L.M., 993 S.W.2d at 289-91. A child's statement made
as a result of custodial interrogation may only be admitted at trial if the child is instructed on his
rights and the statement is made under circumstances that satisfy section 51.095 of the Family Code. 
Tex. Fam Code Ann. § 51.095 (West Supp. 2001); In re L.M., 993 S.W.2d at 291.

 Appellant asserts that school officials are agents of the state and that the
circumstances of his questioning amounted to custodial interrogation, citing to New Jersey v. T.L.O.,
469 U.S. 325 (1985). T.L.O. concerned a Fourth Amendment challenge to the propriety of a school
official's search of a student. 469 U.S. at 328. The United States Supreme Court held that students
should have some protection against unreasonable searches and seizures by public school officials. 
Id. at 334. However, the Court also held that a school official's search of a student under his or her
control need not meet the strict requirements of probable cause. Id. at 341. Instead, the legality of
such a search depends on the reasonableness of the search-first, whether the search was justified at
the inception of the action and second, whether the search, as conducted, was reasonably related in
scope to the circumstances that justified the interference in the first place. Id. The Court noted that
there was a balance to be struck between a student's expectation of privacy and a school's need to
maintain an environment conducive to education:


It is evident that the school setting requires some easing of the restrictions to which
searches by public authorities are ordinarily subject. The warrant requirement, in
particular, is unsuited to the school environment: requiring a teacher to obtain a
warrant before searching a child suspected of an infraction of school rules (or of the
criminal law) would unduly interfere with the maintenance of the swift and informal
disciplinary procedures needed in the schools.



Id. at 340. The Court, while acknowledging that a school official acts as a "representative[] of the
State" in searching a student or carrying out some other disciplinary action, did not equate a school
official with a law enforcement official, as appellant seeks to do. Id. at 336.

 Appellant cites to no Texas cases, and we have been unable to find any, that support
his contention that the questioning performed by Trevino, a school official seeking information in
furtherance of his duty to protect the safety and well-being of students and faculty at the school,
amounted to custodial interrogation and required Trevino to cease his questioning when appellant
asked to speak to his lawyer. A review of case law from other jurisdictions weighs against
appellant's argument. See In re Harold S., 731 A.2d 265, 267-68 (R.I. 1999) (Miranda warnings
only necessary when questioning is by law-enforcement officials; school official was not acting as
agent of police in asking student about alleged assault in official's office while student's father was
present); New Jersey v. Biancamano, 666 A.2d 199, 202-03 (N.J. Super. Ct. App. Div. 1995) (while
Miranda may have some application to interrogation by school officials, officials must have leeway
to question students about violations of school rules); Commonwealth v. Snyder, 597 N.E.2d 1363,
1369 (Mass. 1992) (even if environment of questioning in principal's office was coercive, school
officials were not law enforcement officials or agents, and Miranda did not apply); Florida v. V.C.,
600 So.2d 1280, 1281 (Fla. Dist. Ct. App. 1992) (questioning by assistant principal was reasonable
under T.L.O., and was not custodial interrogation). We find the cases of In re Corey L., 250 Cal.
Rptr. 359 (Cal. Ct. App. 1988), and In re D.E.M., 727 A.2d 570 (Pa. Super. Ct. 1999), particularly
persuasive. 

 In re D.E.M. concerned facts very similar to the cause before us-a police officer
reported to the school principal that D.E.M. was rumored to have a gun on campus. 727 A.2d at 572. 
The principal removed D.E.M. from class, asked if he had anything illegal on campus, and asked to
search his bag and his person. Id. D.E.M. eventually admitted that the gun was in his jacket in
another student's locker. Id. The principal removed the gun from the locker and called the police,
who arrested D.E.M. Id. There was no indication that the police coerced, dominated, or directed
the officials' actions, and the court determined that under the totality of the circumstances the
officials were not acting as agents of the police. Id. at 573-74. The officials investigated whether
D.E.M. had a gun "principally to execute their duty to ensure the safety and welfare of the students
for whom they are responsible." Id. at 574. 

 In re Corey L. concerned a report to a school principal that a student had drugs on
campus. 250 Cal. Rptr. at 360. The principal removed the student from his class and informed him
of the report. Id. When the student denied having any drugs and allowed the principal to search him,
the principal found two bags containing cocaine and called the police, who arrested the student. Id. 
The student moved to suppress the cocaine, arguing the principal should have read him his Miranda
rights before questioning and searching him. Id. The court, while noting that the Supreme Court
has held that school officials are agents of the government in the context of illegal searches, held that
school officials need not read students their Miranda rights before questioning them about suspected
violations of the law or school rules. Id. at 360-61. The court stated, "Questioning of a student by
a principal, whose duties include the obligations to maintain order, protect the health and safety of
pupils and maintain conditions conducive to learning, cannot be equated with custodial interrogation
by law enforcement officers." Id.

 We agree with the cases discussed above and conclude that V.P. was not in police
custody during Trevino's questioning. Cox and Williams, the school hall monitor, removed V.P.
from his class and walked him to Trevino's office. Cox then left the office while Trevino questioned
appellant. Even assuming appellant was in custody as he walked with Cox from his classroom to
Trevino's office, once Cox left the office, V.P. was no longer in custody as Trevino questioned him
about the gun. Trevino questioned V.P. about the gun primarily because he was concerned about
the safety of the other students and faculty. Until the gun was located and the matter turned over to
Cox, Trevino was conducting a school investigation, not a criminal investigation. If Cox had not
gotten the initial report about the gun on campus, Trevino would have been required to tell Cox that
V.P. might have a weapon on campus. See Tex. Educ. Code Ann. § 37.015(a)(5) (West Supp. 2001). 
That Trevino questioned appellant on the basis of a tip from Cox did not transform the questioning
into custodial interrogation, and we have not found any case law indicating that a student has the
constitutional right to remain silent or to consult with a lawyer in the face of questioning by a school
principal. Because V.P. was not in official custody when questioned, he did not have the legal right
to remain silent or to speak to his lawyer. The trial court did not abuse its discretion in denying
appellant's motion to suppress. We overrule appellant's first point of error. 

 In his second point of error, V.P. urges that his motion to suppress should have been
granted because section 52.02 of the Family Code was not followed. See Tex. Fam. Code Ann.
§ 52.02 (West Supp. 2001). Section 52.02 requires that certain procedures be followed when a
juvenile is taken into custody. Id. V.P. specifically contends that section 52.02 was violated because
he was questioned in Trevino's office, not the school's designated juvenile processing office. Id.
§ 52.02(a)(2). However, we have already determined that under the particular facts of this case V.P.
was not in custody during Trevino's questioning, therefore section 52.02 did not apply to the
questioning. Once the gun was located, V.P. was taken into custody by Cox, brought to the
designated office, and processed according to section 52.02. The trial court did not err in overruling
V.P.'s motion to suppress based on violations of section 52.02. We overrule V.P.'s second point of
error.

 Having overruled appellant's points of error, we affirm the trial court's judgment.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed: May 31, 2001

Do Not Publish Released for publication October 4, 2001. Tex. R. App. P. 47.3(c).

1. Cox's office, not Trevino's office, is the school's designated juvenile processing office, as
defined by the Family Code. Tex. Fam. Code Ann. § 52.025 (West Supp. 2001).
2. These rights are commonly referred to as one's Miranda rights. See Miranda v. Arizona, 384
U.S. 436, 467-70 (1966).