# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00422-CV

## In the Matter of V. P.

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. J-19,162, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

On February 16, 2000, appellant V.P., then fourteen years old, hid a gun in a friend's backpack during the bus ride to his middle school. When they arrived at school, he retrieved the gun and asked M.M. to hold it for him. The friend in whose backpack the gun was hidden approached Lance Cox, the Austin Independent School District Police Officer assigned to the school, and told Cox that V.P. had a gun on campus. Cox and Ira Williams, the school's hall monitor, excused V.P. from his class and brought him to speak to Vince Trevino, an assistant principal. V.P. eventually told Trevino where the gun was, and Cox arrested him. V.P. was adjudicated delinquent for the offense of bringing a weapon into a prohibited place and was placed on probation for fourteen months, to be served at a treatment facility in Corsicana. Tex. Penal Code Ann. § 46.03(a)(1) (West Supp. 2001). He appeals in two points of error, arguing the district court erred in refusing to suppress his oral confession and the gun. We will affirm.

## Factual Background

V.P. testified that he brought the gun, which did not work, to school because he was afraid that a group of bullies who had been harassing him would jump him. He testified that when he got to school he retrieved the gun from his friend's backpack and put it in his own backpack. He asked another friend, M.M., to hold the gun for him because he did not want to be caught with it in his possession. The boys went into a restroom, V.P. gave M.M. the gun, and the boys returned to their classes. Williams and Cox then got V.P. out of class and said they had heard he had brought "something illegal" onto campus. V.P. denied knowing anything, and Cox frisked him. Cox and Williams walked V.P. to Trevino's office, where the adults questioned him; Cox left the office during the questioning. V.P. testified that he denied having the gun and asked to talk to his mother and his lawyer as soon as he was asked about it. He said he told the adults his lawyer's name and said they could contact his sister and reach his lawyer and mother through her. V.P. said he first denied knowing about the gun, but then admitted having brought it to school and given it to M.M. Trevino radioed Cox to report that M.M. had the gun, and V.P. and Williams went to M.M.'s classroom; V.P. said Cox and Trevino followed behind them. V.P. told M.M. that the adults knew about the gun and to "just give it up." M.M. walked back to the principal's office with V.P., Williams, Cox, and Trevino and gave the gun to the adults. Cox then handcuffed V.P. and took him to Cox's office, where Cox read V.P. his rights and asked him to fill in some papers and sign his name. Cox took V.P.'s photograph and fingerprints and drove him to Gardner-Betts Juvenile Center. V.P. did not try to leave Trevino's office at any point. He said he did not think he could leave "because [he] was in a serious situation."

2

Cox testified that the girl in whose backpack V.P. had originally hidden the gun approached Cox just before classes started and told him V.P. had brought a gun to school. She described the gun and said it had been hidden in her backpack on the way to school. Cox believed her, so he and Williams got V.P. out of class. Cox asked V.P. if he had anything he was not supposed to have, and V.P. said no. Cox asked if he could search V.P., and V.P. consented. He said they then walked V.P. to Trevino's office.[1] The adults asked V.P. about the gun, and V.P. denied it and "got somewhat defensive." About three or four minutes after he walked V.P. to Trevino's office, Cox left to look elsewhere for the gun. While searching the halls and restrooms, he saw Williams walking M.M. towards Trevino's office, so he returned with them. Once the gun was located, Cox brought V.P. to his office, read him his rights from a written warning form, and had him read and sign the warning and a waiver on the bottom of the form. Cox then called V.P.'s mother to tell her about the situation and to ask her to come to the school.

When asked if V.P. was free to leave the campus before the gun was found, Cox answered,

> Was he free to leave? At that point, we didn't have a weapon. All we had was these kids saying there was a weapon. In my mind, these kids were–they were trustworthy. These are kids I see every day. These girls were visibly upset. I believed that there was a weapon on campus. [V.P.] was, to my knowledge, never instructed not to leave. You know, you have to stay here until we are finished. At the same time, I don't believe it was ever said that you can get up and walk out.

---

[1] Cox's office, not Trevino's office, is the school's designated juvenile processing office, as defined by the Family Code. Tex. Fam. Code Ann. § 52.025 (West Supp. 2001).

Although he believed that the girl who reported the gun was credible, he did not think her statement that V.P. had a gun on campus was by itself enough to give him probable cause to detain V.P. or M.M. Cox was not present for most of Trevino's questioning and did not know whether V.P. asked to speak with his lawyer and mother. Cox was wearing his police uniform that day.

Williams testified similarly to Cox. He and Cox were approached by three female students shortly before classes began, and one of the students said V.P. had brought a gun onto campus. Williams notified Trevino and then went with Cox to get V.P. from his class. V.P. came into the hallway with them, and Cox asked if V.P. had anything at school he was not allowed to have. V.P. replied no, and Cox asked if he could search him. V.P. agreed, and Cox did a quick pat-down search. Cox, Williams, and V.P. then walked to Trevino's office. Cox soon left the office, leaving Trevino and Williams with V.P. For fifteen or twenty minutes, while Williams and Trevino questioned V.P. about the gun, V.P. denied being involved in anything. Williams said he and Trevino "asked for [V.P.'s] help to solve this situation, due to the seriousness of it and the safety of the other students at school." V.P. finally said the gun did not work and told them M.M. had it. V.P. and Williams called M.M. out of class and walked him to Trevino's office. Cox was speaking to a janitor in the hallway outside of M.M.'s class when Williams and V.P. went there. Williams said Cox kept his distance and "was in a supervisory role and . . . monitoring [Williams's] safety." M.M. told the adults where the gun was, and Williams retrieved it. Williams then called Cox on the school radio and to report that he had the gun. Asked whether V.P. was free to leave Trevino's office or the campus before the gun was found, Williams answered, "No student is free to leave the campus. We have a closed campus during school hours."

4

Williams said he briefly left Trevino's office once while V.P. was being questioned. When asked whether V.P. was read his rights before he was questioned, Williams said, "School policy doesn't require me to [read a student his rights] in my job description." Williams said Cox was not in Trevino's office while V.P. was questioned and denied that Cox asked him to question V.P. because Cox could not do so without reading V.P. his rights. Williams said the school's policy allowed him to talk to students and search their backpacks. He said if he found drugs or other illegal items, "then it is turned over to Officer Cox, who handles the legal aspect of it. At that point it is just an administrative process." He said Cox's role at the school is to act as a deterrent for illegal activity and to enforce the law in the event of a crime. Williams's duties concern the safety of the students, faculty, and facilities.

Trevino testified that Williams approached him on the morning of February 16 to say that V.P. might have a weapon at school. Trevino asked Williams to bring V.P. to the office so they "could begin interviewing him and questioning him" about the gun. Trevino said when V.P. was brought to Trevino's office, Cox only stayed for three or five minutes. Cox did not brief Trevino on how to conduct the questioning. After Cox left, Trevino and V.P. continued talking about the gun. Williams was present for most of the thirty or forty minutes Trevino was questioning V.P. Trevino stopped questioning V.P. for about five minutes while Williams left to address another situation in the school. He did not attempt to contact V.P.'s mother until after V.P. admitted bringing the gun to school. He did not read V.P. his rights, nor did he hear Cox or Williams do so. Trevino said:

> My primary concern was to find a weapon. I felt initially that there was a strong
> possibility there was a weapon on campus. I did not know for sure until [V.P.]

answered a few questions that led me to believe there was one. . . . Now the situation was I do now know there is one on campus . . . . I guess because of the current situations involving other things that are going on, we had just established a crisis management plan, what to do in case of these situations. It was a manner of alerting staff and taking action on how do we proceed, do we start locking down. We were in what is referred to as a time crunch. We were approaching changing bells, changing classes within a matter of a few minutes. Whatever chance we may have had of keeping that student and that weapon in that place we were going to lose if we moved 1200 students and trying to make a decision whether we move them or not. Yes, we were in a hurry to try to convince him that we needed to find that weapon, and we found it. It was turned over to us, I think, about 10, 12 minutes before classes changed.

Trevino told V.P. that it would be better for V.P. if he turned over the gun than if someone got hurt with it. He said during the conversation, V.P. seemed to become more willing to turn over the gun. Trevino said he and Williams never raised their voices while they talked to V.P. Trevino knew V.P. had recently lost his father, and he "asked [V.P.] if he felt that his dad would want him to turn the weapon over to us. Shortly after that, he began to tell us that he had given it to [M.M.]." V.P. cried and became emotional when they talked about his father.

When asked why Cox left the interview, Trevino said:

Officer Cox was in my office. [V.P.], when I was asking him about the weapon, he would look at Officer Cox and he would make—you made a statement I didn't want to go to jail, but his focus was more on Officer Cox than myself, even though I was asking the question. We just, I guess, sensed that he was more concerned with Officer Cox being in the room than myself. And working together for four years, we just, you know, looked at each other and kind of just knew intuitively that Officer Cox's presence there was not good and possibly [V.P.] would not cooperate. So Officer Cox left and that's when [V.P.'s] dialog began to change and become cooperative. I guess we were right in our assessment.

6

He believed "that [V.P.] felt that he would not be able to have just a complete, honest dialog with . . . a law enforcement officer present." Trevino explained Cox's role at the school as follows:

> [T]he school administration usually initiates the investigation of allegations and then Officer Cox is brought in for advice or when the determination is made that it is now a legal matter. We have several occasions where individuals are given to me as suspects for drug possession, things of this sort, and it is not until after possibly that I find the drugs or the individual admits to having drugs, then do I turn them over to Officer Cox. It is not out of the ordinary that he is not involved in the initial investigation of it, no.

**Discussion**

In his first point of error, V.P. contends he was in custody from the moment he stepped into the hall and was searched by Cox. V.P. argues that Trevino was an agent of the State and seems to suggest that Trevino specifically acted as Cox's agent during the questioning. Therefore, V.P. argues, Trevino violated V.P.'s rights by not ceasing questioning when V.P. asked to speak to his lawyer, his confession and the gun were inadmissible, and the trial court erred in overruling his motion to suppress.

A trial court's ruling on a motion to suppress will only be set aside on a showing of an abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). In a hearing on a motion to suppress evidence, the trial court, as the trier of fact, determines the weight and credibility to be given a witness's testimony. *Id.* at 138. When reviewing a trial court's evidentiary rulings, we give almost total deference to the court's determination of the historical facts and "mixed questions of law and fact" that apply the law to the case's specific facts and turn on an evaluation of witness credibility and demeanor. *In re L.M.*, 993 S.W.2d 276, 286 (Tex.

7

App.—Austin 1999, pet. denied). We review *de novo* mixed questions that do not require such an evaluation. *Id.* Because there is no disagreement in this case about the facts, we will review *de novo* the district court's determination that appellant was not in custody when he was questioned in Trevino's office. *Id.*

A minor has the same constitutional privilege against self-incrimination as does an adult. *Id.* at 287. Someone taken into custody for questioning must be informed that anything he says may be used against him in court and of his rights to remain silent and to have an attorney present during questioning.[2] *Miranda v. Arizona*, 384 U.S. 436, 467-70 (1966). Therefore, if a minor is in custody and asks to speak to his lawyer before or during questioning, questioning must stop until an attorney is present. *Fare v. Michael C.*, 442 U.S. 707, 717-18 (1979). However, *Miranda* rights only apply to persons subject to custodial interrogation, defined as "the questioning by law-enforcement officers after a person has been taken into custody or otherwise has been deprived of his freedom in a significant way." *In re L.M.*, 993 S.W.2d at 286-87 (citing *Cannon v. State*, 691 S.W.2d 664, 671 (Tex. Crim. App. 1985)).

In determining whether a minor was in custody at the time of questioning, courts consider the age of the defendant and all the circumstances surrounding the interrogation to decide whether there was a formal arrest or a restraint of movement to the degree associated with formal arrest. *Id.* at 287, 289. In other words, courts ask whether, based on the objective circumstances, a reasonable child of the same age would believe his or her freedom of movement was significantly

---

[2] These rights are commonly referred to as one's *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 467-70 (1966).

restricted. *Id.* at 289. Factors relevant to the question of whether a child was in custody include whether there was probable cause to arrest, the focus of the investigation, the officer's subjective intent, and the child's subjective beliefs. *Jeffley v. State*, 38 S.W.3d 847, 855 (Tex. App.—Houston [14th Dist.] 2001, no pet. h.); *see also In re L.M.*, 993 S.W.2d at 289-91. A child's statement made as a result of custodial interrogation may only be admitted at trial if the child is instructed on his rights and the statement is made under circumstances that satisfy section 51.095 of the Family Code. Tex. Fam Code Ann. § 51.095 (West Supp. 2001); *In re L.M.*, 993 S.W.2d at 291.

Appellant asserts that school officials are agents of the state and that the circumstances of his questioning amounted to custodial interrogation, citing to *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). *T.L.O.* concerned a Fourth Amendment challenge to the propriety of a school official's search of a student. 469 U.S. at 328. The United States Supreme Court held that students should have some protection against unreasonable searches and seizures by public school officials. *Id.* at 334. However, the Court also held that a school official's search of a student under his or her control need not meet the strict requirements of probable cause. *Id.* at 341. Instead, the legality of such a search depends on the reasonableness of the search–first, whether the search was justified at the inception of the action and second, whether the search, as conducted, was reasonably related in scope to the circumstances that justified the interference in the first place. *Id.* The Court noted that there was a balance to be struck between a student's expectation of privacy and a school's need to maintain an environment conducive to education:

> It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The warrant requirement, in particular, is unsuited to the school environment: requiring a teacher to obtain a

warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools.

*Id.* at 340. The Court, while acknowledging that a school official acts as a "representative[] of the State" in searching a student or carrying out some other disciplinary action, did not equate a school official with a law enforcement official, as appellant seeks to do. *Id.* at 336.

Appellant cites to no Texas cases, and we have been unable to find any, that support his contention that the questioning performed by Trevino, a school official seeking information in furtherance of his duty to protect the safety and well-being of students and faculty at the school, amounted to custodial interrogation and required Trevino to cease his questioning when appellant asked to speak to his lawyer. A review of case law from other jurisdictions weighs against appellant's argument. *See In re Harold S.*, 731 A.2d 265, 267-68 (R.I. 1999) (*Miranda* warnings only necessary when questioning is by law-enforcement officials; school official was not acting as agent of police in asking student about alleged assault in official's office while student's father was present); *New Jersey v. Biancamano*, 666 A.2d 199, 202-03 (N.J. Super. Ct. App. Div. 1995) (while *Miranda* may have some application to interrogation by school officials, officials must have leeway to question students about violations of school rules); *Commonwealth v. Snyder*, 597 N.E.2d 1363, 1369 (Mass. 1992) (even if environment of questioning in principal's office was coercive, school officials were not law enforcement officials or agents, and *Miranda* did not apply); *Florida v. V.C.*, 600 So.2d 1280, 1281 (Fla. Dist. Ct. App. 1992) (questioning by assistant principal was reasonable under *T.L.O.*, and was not custodial interrogation). We find the cases of *In re Corey L.*, 250 Cal. Rptr. 359 (Cal. Ct. App. 1988), and *In re D.E.M.*, 727 A.2d 570 (Pa. Super. Ct. 1999), particularly persuasive.

*In re D.E.M.* concerned facts very similar to the cause before us–a police officer reported to the school principal that D.E.M. was rumored to have a gun on campus. 727 A.2d at 572. The principal removed D.E.M. from class, asked if he had anything illegal on campus, and asked to search his bag and his person. *Id.* D.E.M. eventually admitted that the gun was in his jacket in another student's locker. *Id.* The principal removed the gun from the locker and called the police, who arrested D.E.M. *Id.* There was no indication that the police coerced, dominated, or directed the officials' actions, and the court determined that under the totality of the circumstances the officials were not acting as agents of the police. *Id.* at 573-74. The officials investigated whether D.E.M. had a gun "principally to execute their duty to ensure the safety and welfare of the students for whom they are responsible." *Id.* at 574.

*In re Corey L.* concerned a report to a school principal that a student had drugs on campus. 250 Cal. Rptr. at 360. The principal removed the student from his class and informed him of the report. *Id.* When the student denied having any drugs and allowed the principal to search him, the principal found two bags containing cocaine and called the police, who arrested the student. *Id.* The student moved to suppress the cocaine, arguing the principal should have read him his *Miranda* rights before questioning and searching him. *Id.* The court, while noting that the Supreme Court has held that school officials are agents of the government in the context of illegal searches, held that school officials need not read students their *Miranda* rights before questioning them about suspected violations of the law or school rules. *Id.* at 360-61. The court stated, "Questioning of a student by a principal, whose duties include the obligations to maintain order, protect the health and safety of

11

pupils and maintain conditions conducive to learning, cannot be equated with custodial interrogation by law enforcement officers." *Id.*

We agree with the cases discussed above and conclude that V.P. was not in police custody during Trevino's questioning. Cox and Williams, the school hall monitor, removed V.P. from his class and walked him to Trevino's office. Cox then left the office while Trevino questioned appellant. Even assuming appellant was in custody as he walked with Cox from his classroom to Trevino's office, once Cox left the office, V.P. was no longer in custody as Trevino questioned him about the gun. Trevino questioned V.P. about the gun primarily because he was concerned about the safety of the other students and faculty. Until the gun was located and the matter turned over to Cox, Trevino was conducting a school investigation, not a criminal investigation. If Cox had not gotten the initial report about the gun on campus, Trevino would have been required to tell Cox that V.P. might have a weapon on campus. *See* Tex. Educ. Code Ann. § 37.015(a)(5) (West Supp. 2001). That Trevino questioned appellant on the basis of a tip from Cox did not transform the questioning into custodial interrogation, and we have not found any case law indicating that a student has the constitutional right to remain silent or to consult with a lawyer in the face of questioning by a school principal. Because V.P. was not in official custody when questioned, he did not have the legal right to remain silent or to speak to his lawyer. The trial court did not abuse its discretion in denying appellant's motion to suppress. We overrule appellant's first point of error.

In his second point of error, V.P. urges that his motion to suppress should have been granted because section 52.02 of the Family Code was not followed. *See* Tex. Fam. Code Ann. § 52.02 (West Supp. 2001). Section 52.02 requires that certain procedures be followed when a

juvenile is taken into custody. *Id.* V.P. specifically contends that section 52.02 was violated because he was questioned in Trevino's office, not the school's designated juvenile processing office. *Id.* § 52.02(a)(2). However, we have already determined that under the particular facts of this case V.P. was not in custody during Trevino's questioning, therefore section 52.02 did not apply to the questioning. Once the gun was located, V.P. was taken into custody by Cox, brought to the designated office, and processed according to section 52.02. The trial court did not err in overruling V.P.'s motion to suppress based on violations of section 52.02. We overrule V.P.'s second point of error.

Having overruled appellant's points of error, we affirm the trial court's judgment.

_____

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed: May 31, 2001

~~Do Not Publish~~ Released for publication October 4, 2001. Tex. R. App. P. 47.3(c).

13