692 A.2d 1068

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Michael HAWKINS, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 12, 1996.

Decided April 22, 1997.

---

David Zuckerman, Philadelphia, for Michael Hawkins.

Catherine Marshall and Hugh J. Burns, Jr., Philadelphia, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

FLAHERTY, Chief Justice.

This case concerns whether a police radio broadcast that a man of a particular description is carrying a gun may serve as the justification for a search of that person and the seizure of the gun he is carrying when the arresting officer is unable to authenticate the telephone message on which the radio broadcast was based or provide an independent basis for the stop and frisk.

On November 19, 1993, a Philadelphia police officer responded to a radio call that there was a man with a gun at Sydenham and York Streets. The suspect was described as a black male wearing a blue cap, black jeans and a gold or brownish coat. When the officer arrived, he observed Hawkins, who fitted the radio description. He then stopped and frisked Hawkins, finding a .22 caliber revolver in his waistband. At the suppression hearing, the officer stated that he

did not know the source of the information contained in the radio call. No other testimony established the source of the call or the basis for the information.

On May 25, 1994, Hawkins was convicted of a violation of the Uniform Firearms Act[1] and sentenced to twenty-one months probation. A writ of certiorari in the court of common pleas was denied and Hawkins appealed to Superior Court. On July 20, 1994, Superior Court, in a memorandum opinion, affirmed the conviction. This court granted allocatur.

■ The existing law with respect to searches such as the one conducted in this case is based on *Terry v. Ohio,* supra, which held that police are authorized under the Fourth Amendment to stop and temporarily detain citizens short of an arrest when they can point to "specific and articulable facts" causing them to have a reasonable suspicion that "criminal activity may be afoot." 392 U.S. at 21, 30, 88 S.Ct. at 1880, 1884, 20 L.Ed.2d at 905–06, 911; *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 228 (1996); *Commonwealth v. Hicks,* 434 Pa. 153, 160, 253 A.2d 276, 280 (1969). If police reasonably believe that they may be in danger, they may conduct a limited pat-down search of the suspect's outer garments for weapons. *Ybarra v. Illinois,* 444 U.S. 85, 92–93, 100 S.Ct. 338, 342–43, 62 L.Ed.2d 238, 246 (1979); accord, *Commonwealth v. Melendez,* supra. Thus, before police may briefly detain a person, there must be reasonable suspicion of criminal conduct, and before police may pat down for weapons, there must be a reasonable belief that the suspect is presently armed and dangerous.[2] The initial question with which any analysis of this case must begin, therefore, is whether the

1.  18 Pa.C.S. §§ 6106, 6108.

2.  *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 230 (1996) makes it clear that the requirements of *Terry* are also the requirements of Art. I, § 8 of the Pennsylvania Constitution, and we decide the present case on the basis of Art. I, § 8 of the Pennsylvania Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

police officer had grounds for reasonable suspicion that criminal activity was afoot.

When police receive an anonymous call alleging that a person of a particular description is carrying a gun at a particular location and the police broadcast this information to radio patrol cars, neither the police dispatcher nor the officers in the cars know whether the information is reliable. It may be a prank call. For this reason, in *Commonwealth v. Queen,* 536 Pa. 315, 320, 639 A.2d 443 (1994), we held that "a stop and frisk may be supported by a police radio bulletin *only* if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion." [3] To hold otherwise would be to sanction police interference with citizens upon less than the reasonable suspicion of criminal activity required by *Terry*.

The Superior Court reasoned that because the officer arrived within three minutes of receiving the call, because Hawkins fitted the description of the man on the radio broadcast, and because Hawkins allegedly had a gun, there was "sufficient corroboration" of the phone call to give the officer reasonable suspicion that Hawkins was "armed and dangerous." Superior Court erroneously believed that these factors were sufficient to justify the search of appellant and the seizure of his gun.

If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone

---

3. Although it is not part of this case, the police might also justify an investigative stop based on a tip if they knew the identity of the person giving the tip and the basis of his knowledge. See *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (an informant's veracity, reliability, and basis of knowledge are "highly relevant" in determining whether the informant has provided reasonable suspicion of criminal activity); *Commonwealth v. Queen,* supra.

Additionally, if the tip is anonymous, police may reasonably rely on it if is predictive of the suspect's behavior. See *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

at a particular location. As the United States Supreme Court observed in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct. The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion.

■ The Commonwealth takes the radical position that police have a duty to stop and frisk when they receive information from any source that a suspect has a gun. Since it is not illegal to carry a licensed gun in Pennsylvania,[4] it is difficult to see where this shocking idea originates, notwithstanding the Commonwealth's fanciful and histrionic references to maniacs who may spray schoolyards with gunfire and assassins of public figures who may otherwise go undetected. Even if the Constitution of Pennsylvania would permit such invasive police activity as the Commonwealth proposes—which it does not—such activity seems more likely to endanger than to protect the public. Unnecessary police intervention, by definition, produces the possibility of conflict where none need exist.

Contrary to the Commonwealth's view, the public will receive its full measure of protection by police who act within the restraints imposed on them by Art. I, § 8 of the Constitu-

4. In all parts of Pennsylvania, persons who are licensed may carry concealed firearms. 18 Pa.C.S. § 6108. Except in Philadelphia, firearms may be carried openly without a license. See *Ortiz v. Commonwealth*, 545 Pa. 279, 283, 681 A.2d 152, 155 (1996) (only in Philadelphia must a person obtain a license for carrying a firearm whether it is unconcealed or concealed; in other parts of the Commonwealth, unconcealed firearms do not require a license).

tion of Pennsylvania and this court's relevant caselaw. Upon receiving unverified information that a certain person is engaged in illegal activity, the police may always observe the suspect and conduct their own investigation. If police surveillance produces a reasonable suspicion of criminal conduct, the suspect may, of course, be briefly stopped and questioned (the *Terry* investigative stop), and, if the officer has reasonable fear for his safety, police may pat down the suspect's outer garments for weapons.[5]

In this case, the police acted on an anonymous tip and had no basis for believing that the tip was reliable. They also had no independent reason to believe that the suspect may have been involved in criminal activity. But *Queen* requires that "a stop and frisk may be supported by a police radio bulletin *only* if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion." 536 Pa. at 320, 639 A.2d at 445. Here, no facts were offered which supported the suspicion created by the anonymous call. The judgment of sentence must, therefore, be reversed.

NIGRO, J., concurs in the result.

NEWMAN, J., files a dissenting opinion in which CASTILLE, J., joins.

NEWMAN, Justice, dissenting.

I agree with the Majority that Article I, Section 8 of the Pennsylvania Constitution vigorously protects each citizen's personal privacy, but I believe the Majority has failed to properly weigh the countervailing safety interests of the public and the police when responding to a "man with a gun" tip in its analysis pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The reality of law enforcement in today's society is that bank robbers, fanatics and other

5. We do not address the scenario in which the officer has an independent reason to believe that a crime (carrying an unlicensed gun) may be in progress, inquires as to whether the gun is licensed and the person does not answer.

gunmen are fully armed and ready to indiscriminately kill citizens and police.[1] The Majority loses sight of the fact that *Terry* was written to help protect police from the dangers of armed suspects. Therefore, I respectfully dissent and call out for the protection of people in law enforcement and in our entire society through a proper evaluation of their safety interests pursuant to the Fourth Amendment to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution.[2]

In *Terry*, the United States Supreme Court created an exception to the Fourth Amendment's requirement that police have probable cause before conducting a search of a citizen. *Terry* requires a police officer to first provide specific and articulable facts that criminal activity is afoot to justify stopping a citizen and then to establish that he had an objectively reasonable belief that the individual was armed and dangerous before he conducted a protective frisk. In formulating this test, the Court balanced the privacy interests of the citizen with the safety interests of the police officer and the public. While considering that a search of the outer clothing for

1. Recently, a group of armed men dressed like commandos, entered a bank, and when their robbery went sour, they came out firing, injuring eleven police officers and six bystanders. "Two Robbers Slain After Bank Heist Identified," Los Angeles Times, March 2, 1997 at 1. A gunman also opened fire on February 23, 1997, at the Empire State Building, killing one man and wounding several other bystanders. "Man Shoots Seven, Self at Empire State Building," Philadelphia Inquirer, February 24, 1997 at A–1. According to the National Association of Chiefs of Police, nearly one-half of the one hundred and eighteen police officers who died in the line of duty in 1996 were shot to death. "California tops in officers' deaths," United Press International, December 31, 1996.

2. I am mindful of the concern that allowing police to stop and frisk an individual carrying a gun, without corroboration of an anonymous tip, can bring us one step closer to a police state and possible police brutality. Recently, the Justice Department issued a report finding a long-term pattern of police brutality in Pittsburgh. However, according to city Controller Tom Flaherty, the Pittsburgh police department responded to 2.5 million calls and arrested 200,000 people with only 238 sustained complaints of mistreatment from 1986 to 1996. Thus, the number of complaints of police brutality was relatively small. "Police Union President Rips Into Justice Report," Pittsburgh Post–Gazette, February 14, 1997 at D–2.

weapons is a "severe, though brief, intrusion upon cherished personal security," the Court acknowledged the following:

[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry*, 392 U.S. at 24, 88 S.Ct. at 1881. The Court balanced these interests by holding as follows:

Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

*Id.* at 27, 88 S.Ct. at 1883. Clearly, the safety interests of the police were a core intention of the *Terry* exception to the probable cause requirement.[3]

After *Terry*, the United States Supreme Court in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), considered whether the police had reasonable suspicion to conduct a *Terry* stop and frisk based on a known informant's tip. In *Adams*, a police officer was in his patrol car in a high-crime area of Bridgeport, Connecticut, when a known informant approached the patrol car and informed the officer that a person seated in a nearby vehicle had narcotics and a gun.

3. The requirements for a constitutional "stop and frisk" are the same pursuant to Article I, Section 8 of the Pennsylvania Constitution and the *Terry* line of cases interpreting the Fourth Amendment. *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996). Therefore, I do not see a good reason to limit the analysis to Article I, Section 8. Accordingly, I will conduct my analysis utilizing opinions interpreting the Fourth Amendment.

The officer radioed for backup and then approached the car, asking the occupant to open the door. When the occupant rolled down the window, the officer reached into the car and took a fully loaded gun from the occupant's waistband. The officer then arrested the occupant for possessing an illegal gun.

The United States Supreme Court concluded that the officer properly relied on the known informant's tip to establish that criminal activity was likely to occur. It also upheld the protective search because the officer was alone in a high-crime area at two o'clock in the morning and the tipster stated that the occupant of the car was armed. While the Court concluded that the search was a "limited intrusion designed to insure his [the officer's] safety," *Adams*, 407 U.S. at 148, 92 S.Ct. at 1924, it also noted, "this is a stronger case than obtains in the case of an anonymous telephone tip." *Id.* at 146, 92 S.Ct. at 1923.

In *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the United States Supreme Court directly addressed whether an anonymous tip can provide reasonable suspicion for a *Terry* stop and frisk. The police in *White* received an anonymous telephone lead that the appellant was going to leave a specific apartment building at an exact time carrying cocaine in a briefcase. The tipster also said she would then drive in a brown Plymouth station wagon with a broken right taillight to Dobey's Motel. During surveillance, police did observe appellant leave the building, enter a brown Plymouth station wagon with a broken taillight and drive to Dobey's Motel.

The United States Supreme Court held that in determining reasonable suspicion, that the "content of the information" and "its degree of reliability" are considered according to the totality of the circumstances.[4] *White*, 496 U.S. at 330, 110 S.Ct. at 2416. The United States Supreme Court opined that because the police confirmed through surveillance that a wom-

4. The United States Supreme Court adopted the "totality of the circumstances" analysis to assess the reliability of an informant's tip in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

an left a specific building and entered a particular car within a general time frame, and the anonymous tipster could provide information concerning the suspect's future behavior, the police had sufficient corroboration of the anonymous tipster's allegation of criminal activity to constitute reasonable suspicion to justify the stop.

Thus, *White* sets forth that police may obtain sufficient independent corroboration of an anonymous tip through the observation of a suspect's predicted innocent activity. That surveillance serves to establish the informant's reliability. The police may then appropriately stop the suspect by relying on the tipster's information that the suspect is engaged in criminal activity, even if the police do not observe any illegal activity.

In *Hawkins,* the police responded to an anonymous lead that a black male wearing a blue cap, black jeans and a gold or brown colored coat was holding a gun at the corner of Sydenham and York Streets in Philadelphia. Within three minutes, the police arrived at that location and ascertained that Hawkins matched the tipster's description. Thus, as in *White,* police could independently corroborate the tipster's information by observing a person matching the informant's description at a particular location and at a specific time.

This case differs from *White* because the informant here did not predict the suspect's future behavior; however, he did alert the police that the suspect possessed a gun on a public street. Several circuit courts have upheld a *Terry* stop based solely on an anonymous tip in this exact situation, where the police have identified a person matching an anonymous tipster's description of a suspect who has a gun. *See, e.g., United States v. Clipper,* 973 F.2d 944 (D.C.Cir.1992); *United States v. Bold,* 19 F.3d 99 (2d Cir.1994). These cases have created an exception to *White*'s corroboration requirement when an anonymous tip describes a "man with a gun."

The United States Court of Appeals for the District of Columbia was the first court to conclude that a "man with a gun" anonymous tip, which is confirmed only by police identifi-

cation of a man matching the tipster's description, constitutes reasonable suspicion to stop and frisk the suspect. *Clipper.* In *Clipper,* two officers responded to a police broadcast based on an anonymous phone call that an individual at a certain location wearing specific clothing was carrying a gun. The officers arrived at the location and found Clipper, who matched the description. Police conducted a pat-down of Clipper, and although they did not find a gun, they did find drugs. Clipper claimed the police did not have reasonable suspicion to conduct a *Terry* stop and frisk. However, the D.C. Circuit held as follows:

> We believe that the totality of the circumstances to which the Court refers in *Alabama v. White* must include those in which the anonymous informant makes no predictions, but provides the police with verifiable facts while alerting them to **an imminent danger that the police cannot ignore except at risk to their personal or the public's safety.**

*Clipper,* 973 F.2d at 949–950 (emphasis added). The D.C. Circuit cited statistics confirming that firearms pose unique dangers to police responding to disturbance calls; in 1987, of the 2,789 police officers attacked with firearms nationwide, seven hundred of the assaults "occurred while an officer was responding to a disturbance call, such as a report of a man with a gun." *Clipper,* 973 F.2d at 950. It continued by noting that "any fair reading of *Terry* and its progeny reveals that these decisions involve a careful balancing of interests" and that *Terry* itself specifically identified the safety of the officers and the public as legitimate interests that must be protected in this reasonable suspicion analysis. *Id.* at 950. The D.C. Circuit concluded that

> [t]his element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in 'controlled buys.' Where guns are involved, however, there is the risk that an attempt to 'wait out' the suspect might have fatal consequences.

*Id.* at 951.[5]

In *Bold,* the Second Circuit weighed the interests of citizen privacy versus police safety in a similar situation and adopted the *Clipper* rule. New York City police, in *Bold,* responded to a radio call based on an anonymous tip that a man wearing a hooded sweater in a grey Cadillac, in the parking lot at a White Castle restaurant, had a gun. Police found the grey Cadillac and asked the passengers to step out of the car. Ultimately, police located a toy gun on the floor of the car along with cash stolen in a bank robbery earlier that day. The Court reiterated *Clipper*'s statistics concerning handgun violence, and noted that the overwhelming majority of people in New York City and State are not licensed to carry firearms. The Second Circuit concluded as follows:

> Considering the totality of the circumstances in this case, including the limited ability of the officers to confirm all of the anonymous tip information, the report that the occupants of the car possessed a gun, and the statistical likelihood that the gun was illegal, we conclude that the intrusion upon the privacy of the car's occupants was minimal and that the officers had a reasonable suspicion under *Terry* that authorized their opening of the car doors and questioning the occupants.

*Bold,* 19 F.3d at 104.

Similarly, the Seventh and Eleventh Circuits have upheld searches of suspects who matched the descriptions provided in anonymous tips about men with guns. *See e.g., United States v. Gibson,* 64 F.3d 617 (11th Cir.1995) (totality of the circumstances established reasonable suspicion to search men matching an anonymous tipster's description of "men with guns."); *United States v. DeBerry,* 76 F.3d 884 (7th Cir.1996)(same); *Speight v. United States,* 671 A.2d 442 (D.C.1996). In fact, no

**5.** The *Clipper* Court also noted that the criminal laws against providing false information to law enforcement officials serve as both a deterrent and a punishment for persons who might fabricate a tip. In Pennsylvania, 18 Pa.C.S. § 4906 makes it a misdemeanor to knowingly give false information to a law enforcement officer with the intent to implicate another person. This statute will deter and punish individuals who might fabricate false "man with gun" calls.

circuit court that has considered the issue has found that a *Terry* stop and frisk under such circumstances violated the Fourth Amendment. *But see, Commonwealth v. Alvarado,* 423 Mass. 266, 667 N.E.2d 856 (1996)(stop based on anonymous "man with gun" tip violated article 14 of the Massachusetts Constitution).[6]

This analysis extends *White*'s holding by concluding that if police obtain independent corroboration of an anonymous "man with gun" tip by observing a suspect matching the informant's description and location, the police have sufficiently established the informant's reliability. Given their own knowledge of the statistical likelihood that the concealed gun is illegally unlicensed, police may then reasonably conclude that criminal activity is afoot and the suspect is armed and dangerous. I believe that these courts have struck a balance between the privacy interests of citizens and the interests of the public in safety that is consistent with the intent of *Terry* under the totality of the circumstances in "man with gun" cases.

In *Hawkins,* I would particularly emphasize, while considering the totality of the circumstances, the specific dangers that disturbance calls pose to Philadelphia's police force. For example, in 1995, Philadelphia police were assaulted 640 times when responding to disturbance calls such as those complaining of a man with gun. 1995 Uniform Crime Report, A–18. Assaults during disturbance calls represent 53.5% of the total assaults against Philadelphia law enforcement officers.[7] *Id.*

On the other hand, we must consider the nominal intrusion that occurs when police conduct a protective frisk. During a pat-down, police simply feel the outer surface of a suspect's garments. They do not enter pockets of interior clothing

6. The Third Circuit specifically reserved the issue of the corroborating factors required for an anonymous tip identifying a man with a gun in *United States v. Roberson,* 90 F.3d 75 n. 4 (3d Cir.1996), which involved an anonymous tip alleging that a man was dealing drugs.

7. The gun assaults against police continued on February 25, 1997, when a suspect shot an officer three times in the legs in West Philadelphia. "Cop shot in Philadelphia," State News Briefs, February 25, 1997.

unless they feel an object that could be a concealed weapon. Further, as noted by the *Clipper* court, mere surveillance or attempts to approach and question "man with gun" suspects could have grave consequences. Clearly the safety interests of the police in a "man with gun" case outweigh the limited invasion of privacy that occurs during a patdown search.

Thus, I would find that the balancing test in *Terry* should be resolved in favor of the police in "man with gun" cases. The Majority's interpretation of *Terry* in "man with gun" cases ties the hand of the police and leaves them susceptible to ambush and assault. Therefore, I urge this Court to adopt a "man with gun" exception to *White*'s corroboration requirement.

The Majority also holds that a "man with gun" tip, even if corroborated, does not create a reasonable suspicion of criminal activity sufficient to justify a stop and frisk, because persons who are licensed may possess a firearm in public in Pennsylvania pursuant to 18 Pa.C.S. § 6106. The Majority implies that a tip that a man is carrying a gun is not an allegation of criminal activity in Pennsylvania. However, an overwhelming majority of Pennsylvanians are not licensed to carry concealed weapons. In 1995, there were 569,817 licenses to carry concealed firearms in Pennsylvania,[8] which represents between 3–5% of the population. Furthermore, this "man with a gun" call occurred in Philadelphia, where a person must have a license to carry a firearm, whether it is concealed or unconcealed. 18 Pa.C.S. § 6108. Section 6108 provides as follows:

**§ 6108. Carrying firearms on public streets or public property in Philadelphia**

No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless:

(1) such person is licensed to carry a firearm; or

8. Statistics that the Pennsylvania State Police provided to the Administrative Office of the Pennsylvania Courts.

(2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license).

Less than one percent (1%) of the population of Philadelphia is licensed to carry a concealed firearm.[9] Thus, a phone call concerning a man with a gun may indeed be an allegation that the criminal activity of carrying a concealed or unconcealed gun without a license is occurring.

The Majority discounts the Commonwealth's argument to protect the police and public as "fanciful and histrionic references to maniacs who may spray schoolyards with gunfire."[10] However, I can think of no more compelling reason for the police to conduct a *Terry* stop and frisk than in a situation where they receive a tip that a man with a gun is lingering around a schoolyard. I shudder to think what might happen if the police were forced, as the Majority suggests, to wait for the man to use the gun before they could act.

Accordingly, I would hold that under the totality of the circumstances here, where police immediately found Hawkins, who matched the informant's description of a "man with a gun" at an exact location in the middle of the night and, given the likelihood that the gun was illegal, police had sufficient reasonable suspicion that there was a reasonable suspicion of criminal activity to stop Hawkins and conduct a protective frisk. *See Clipper; Bold.*

CASTILLE, J., joins in this dissenting opinion.

9. Between 1992 and 1995, there were approximately one thousand gun licenses per year issued for Philadelphia County. In 1996, after the 1995 amendments to the Uniform Firearms Act, there were 9,849 licenses to carry concealed firearms issued. However, even with this dramatic increase, less than 1% of the population has a license to carry concealed firearms. Statistics that Pennsylvania State Police provided to the Administrative Office of Pennsylvania Courts.

10. The horrible tragedies in Stockton, California, where a gunman entered a schoolyard and shot and killed five children and injured twenty-nine others in 1989, and Dunblane, Scotland in 1996, where a gunman killed sixteen children and their teacher, contradict the Majority's claim that the possibility of a schoolyard massacre is the Commonwealth's fanciful invention.