COMMONWEALTH OF
PENNSYLVANIA,
Appellee,

v.

Rassan SHINE, Appellant

Superior Court of Pennsylvania.

Submitted June 4, 2001.
Filed Sept. 25, 2001.

Karl Baker, Public Defender, Philadelphia, for appellant.

Before: HUDOCK, J., CERCONE, President Judge Emeritus, and BECK, J.

HUDOCK, J.:

¶ 1 This is an appeal from the judgment of sentence imposed after Appellant was convicted, at the conclusion of a bench trial, of two violations of the Uniform Firearms Act and possession of a controlled substance (cocaine).[1] He was sentenced to an aggregate term of fifteen to thirty-six months' incarceration, followed by five years of reporting probation. A post-sentence motion was filed and denied. In this direct appeal, Appellant challenges the denial of his motion to suppress physical evidence. We affirm.

¶ 2 When "reviewing the ruling of a suppression court, an appellate court must first ascertain whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn" from such findings. *Commonwealth v. Gommer*, 445 Pa.Super. 571, 665 A.2d 1269, 1270 (1995) (quotation marks and citation omitted). "When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Queen*, 536 Pa. 315, 319, 639 A.2d 443, 445 (1994) (citation omitted). "With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this [C]ourt." *Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1032 (1995) (citations omitted). Moreover, we are bound by those findings that are supported by the record and may only reverse if the legal conclusions drawn therefrom are in error. *Gommer*, 665 A.2d at 1270.

¶ 3 With regard to the suppression motion, the Commonwealth presented the testimony of two police officers.[2] Although

---

1. 18 Pa.C.S.A. §§ 6106 (firearms not to be carried without a license), 6108 (carrying firearms on public streets or public property in Philadelphia) and 35 P.S. § 780–113(a)(16).

2. Appellant presented no testimony, but a transcript of the radio call that was received that evening was admitted into evidence.

not labeled as factual findings, the trial court summarized the following facts based upon the officers' testimony:

On September 18, 1998, at approximately 12:00 a.m., Philadelphia Police Officer Michael Davis was in uniform, driving a marked police vehicle while on routine patrol in the area of 65th Street in Philadelphia. In response to a radio call indicating, "Black males on the highway with guns" Davis immediately went to the area of 65th and Kingsessing Streets where he observed Appellant and another male engaged in an intense argument. Appellant was making gestures with his hands, leaning the upper portion of his body forward towards the other male, and nudging himself forward. A woman was observed trying to push the males apart in an apparent attempt to keep them from fighting. This scenario led Officer Davis to believe that Appellant was engaged in a possible fight and an argument, thus causing a disturbance on the highway. Officer Davis patted down the two males and did a cursory check of the female, checking only for bulges. In his three (3½) [sic] and a half years as a police officer, Officer Davis had performed thousands of pat downs, and had previously felt a weapon approximately 50 to 100 times. As he conducted the pat down of Appellant, Officer Davis felt a gun in Appellant's pants pocket. He removed the gun and arrested Appellant.

Officer Carim Mitchell arrived at the scene as back-up to Officer Davis. As Appellant was taken into custody Mitchell, in accordance with police procedure, conducted a safety pat down which led to the recovery of a cellophane wrapper containing ten (10) black ziplock [sic] packets of cocaine from Appellant's left front pocket.

Trial Court Opinion, 7/18/00, at 2–3 (footnotes and references to notes of testimony omitted).

¶ 4 In light of these facts, which are amply supported by the record, the trial court concluded that, given the totality of the circumstances, including the radio call and Officer Davis' observations upon arriving at the scene, the stop and frisk of Appellant was proper. In its Rule 1925(a) opinion, the trial court provided further support for its conclusion:

Here, considering the totality of the circumstances, this Court found that there was enough evidence to support the police officer's actions. The officer had knowledge that there were males with guns at 65th and Kingsessing when he arrived shortly after the radio broadcast to discover Appellant and another male engaged in a heated argument, possibly a fight. The two males were very close to each other's faces, angry and loud. It is reasonable to believe that given the nature of the radio call, along with the Officer's observations of the threatening behavior of the two males with someone in the middle trying to stop the impending fight, at [12:00 a.m.] on a street corner that the safety of those involved along with that of the police officer were at stake. The officer's actions were justified and Supression Motion was properly denied.

Trial Court Opinion, 7/18/00, at 4 (references to notes of testimony omitted).

¶ 5 On appeal, Appellant claims that the trial court's legal conclusion is in error because

"[t]he anonymous radio information is insufficient to conduct a stop, and the officer independently observed no conduct which would permit a "stop." Even if the officer had a right to investigate the argument between the males, he did not take that minimally intrusive action,

but instead immediately subjected the males to a frisk. That frisk, which requires that the officer articulably believe that the suspect is armed and dangerous, was performed here without justification, the officer stating only that because "there's a lot of weapons out there," he performed the frisk for his own safety, without providing the necessary additional justification for doing so based upon the existence of criminal or suspicious conduct by [A]ppellant. There is nothing in the officer's direct observation that would support such a justification, and the radio call alone or in conjunction with his observations will not support it.

Appellant's Brief at 8–9. We cannot agree.

¶ 6 We first consider the propriety of the stop. As our Supreme Court has recently summarized:

Our "inquiry is a dual one—whether the officers' action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), quoted in *Commonwealth v. Hicks,* 434 Pa. 153, 158, 253 A.2d 276, 279 (1969). Regarding the stop, a police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot. *See Terry,* 392 U.S. at 21, 30, 88 S.Ct. at 1880, 1884; *Commonwealth v. Allen,* 555 Pa. 522, 527, 725 A.2d 737, 740 (1999). The fundamental inquiry is an objective one, namely, whether "the facts available to the officer at the moment of the [intrusion] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880

(citations omitted). This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, *see United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability. *See Alabama v. White,* 496 U.S. 325, 330–31, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990).

*Commonwealth v. Zhahir,* 561 Pa. 545, 552, 751 A.2d 1153, 1156–57 (2000).

¶ 7 In asserting that Officer Davis did not have reasonable suspicion to stop him, the majority of Appellant's argument focuses on the anonymous nature of the call and the scant and, at times, equivocal, information provided. In doing so, Appellant relies upon the details of the call as demonstrated by the transcript of the radio call. *See* Appellant's Brief at p. 14–16. He also argues that the radio call at issue is "indistinguishable" from the anonymous tip information deemed insufficient to support an investigatory stop in *Commonwealth v. Hayward,* 756 A.2d 23 (Pa.Super.2000). In *Hayward,* a campus police officer received a tip from an anonymous pedestrian that a tall man among a group of six to eight males in a nearby park was "brandishing a weapon." When arriving at the park ten minutes later, the officer saw a group of eight or nine people, although none of them was holding a gun. *Hayward,* 756 A.2d at 25. After directing the group to "line-up" on the sidewalk, the officer asked if any of them had weapons, and the defendant volunteered that he did. *Id.* at 26. Given these facts, this Court reasoned:

Since the identity and veracity of the pedestrian informant remained unknown, there was therefore no objective basis under these particular circum-

stances for the officer to conclude that the information provided by this individual was accurate or reliable. Thus, the officer needed "something more" than the tip itself to effectuate a *Terry* stop of an individual who might possibly be the subject of the tip. He needed some independent corroboration of that individual's involvement in criminal activity.

However the officer upon arriving in the park did not independently observe [the defendant] or any other individuals present engaging in anything remotely resembling criminal activity.... [The defendant] and the other individuals in the park were merely present in a public area when the officer arrived on the scene. The tip itself provided no specific predictive basis as to the activities of any of the individuals present in the park that would not be known to anyone in the public at large. There was therefore no other basis, aside from the word of an anonymous pedestrian, to infer that [the defendant] had been actively involved in the commission of a crime *or would be actively involved in the commission of a crime in the immediate future.*

*Hayward,* 756 A.2d at 35 (emphasis added).

¶ 8 Unlike the facts in *Hayward,* however, in the present case we have "something more" than a vague, anonymous tip. As our Supreme Court has explained:

Where ... the source of the information given to the officers is unknown, the range of details provided and the prediction of future behavior are particularly significant, as is corroboration by independent police work. *See [Alabama v.] White,* 496 U.S. [325] at 332, 110 S.Ct [2412] at 2417 [110 L.Ed.2d 301 (1990)]. While verification of predictive information constitutes one avenue of obtaining the necessary corroboration of informa-

tion from a source of unknown reliability, *see id., the necessary corroboration may also be supplied by circumstances that are independent of the tip,* for example, observation of suspicious conduct on the part of the suspect. *See Allen,* 555 Pa. at 529, 725 A.2d at 741. *See generally United States v. Roberson,* 90 F.3d 75, 80 (3rd Cir.1996)(noting that in the context of an anonymous tip, the absence of predictive information would not necessarily invalidate it as a consideration in the totality of the circumstances, if, after corroborating readily observable facts, police had observed unusual or suspicious conduct on the suspect's part.) *In this regard, the time, street location, and the movements and manners of the parties bear upon the totality assessment, see Commonwealth v. Lawson,* 454 Pa. 23, 28, 309 A.2d 391, 394, (1973), as does an officer's experience. *See Commonwealth v. Banks,* 540 Pa. 453, 455, 658 A.2d 752, 753 (1995).

*Zhahir,* 561 Pa. at 553, 751 A.2d at 1157 (emphasis added).

■ ¶ 9 Had Officer Davis merely observed Appellant standing on or near the street corner talking with the other male and female, we would find that he lacked reasonable suspicion to conduct an investigatory stop. However, within minutes of receiving a report over the police radio regarding the presence of "two Black males with guns on the highway" in the area of 65th Street, he personally saw two men, including Appellant, engaged in a heated argument. According to the officer, it looked like Appellant and the other man were about to fight and, in fact, a woman was also present who appeared to be trying to separate the men. Thus, given his observation of what he perceived to be an escalating disturbance on the street, coupled with his knowledge of the recent

report that men at that location were armed, Officer Davis was justified in stopping Appellant to investigate the situation and try to defuse a potentially dangerous situation.

¶ 10 Appellant argues that Officer Davis lacked reasonable suspicion that criminal activity was afoot because, as he characterizes the situation, he and the other male were only arguing. As noted above, however, credibility determinations are for the suppression court. *Benton, supra.* At the suppression hearing, Officer Davis described in detail Appellant's facial expressions and body movements in explaining that Appellant was about to engage in a fight. The suppression court characterized Appellant's conduct as "threatening behavior." Trial Court Opinion, 7/18/00, at 4. At the suppression hearing, Officer Davis testified that he approached Appellant because he believed a "fight" or "disturbance" was occurring. N.T., 3/26/99, at 9. Thus, because the trial court credited the officer's characterization of Appellant's interaction with the other male, Officer Davis possessed reasonable suspicion that Appellant was involved "or would be actively involved in the commission of a crime in the immediate future[.]" *Hayward,* 756 A.2d at 35. *See* 18 Pa.C.S.A. § 5503(a)(1) (explaining that a person is guilty of disorderly conduct if "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... engages in fighting or threatening, or in violent or tumultuous behavior[.]").

¶ 11 In the alternative, Appellant argues that, even if the stop was proper, Officer Davis was not justified in frisking him because the officer lacked reasonable suspicion that he was armed and dangerous. According to Appellant, Officer Davis frisked him only because "[t]here's a lot of weapons out there[.]" N.T., 3/26/99, at 14. We cannot agree.

¶ 12 As our Supreme Court has stated:

Review of an officer's decision to frisk for weapons requires balancing two legitimate interests: that of the citizen to be free from unreasonable searches and seizures; and that of the officer to be secure in his personal safety and to prevent harm to others. *See Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). To conduct a limited search for concealed weapons, an officer must possess a justified belief that the individual, whose suspicious behavior he is investigating at close range, is armed and presently dangerous to the officer or to others. *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881; *Allen,* 555 Pa. at 528, 725 A.2d at 740. In assessing the reasonableness of the officer's decision to frisk, we do not consider his "unparticularized suspicion or 'hunch,' but [rather] ... the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

*Zhahir,* 561 Pa. at 554, 751 A.2d at 1158.

■ ¶ 13 In the present case, however, Officer Davis did not frisk Appellant based only upon his belief that a lot of people on the streets in the particular area of the stop carry weapons. Rather, he observed Appellant engaged in a heated argument with another male within minutes of receiving a radio call that two men were on the highway with guns. "[I]n view of the immediacy of the situation confronting the officer, common sense dictates that preference be given to his personal safety." *Zhahir,* 561 Pa. at 555, 751 A.2d at 1158. Moreover, as noted above, Officer Davis was alone, was confronted with what he perceived to be an escalating violent situation involving three people, and the hour

was late. *See Commonwealth v. Patterson*, 405 Pa.Super. 17, 591 A.2d 1075, 1078 (1991) (holding that a weapons search of the defendant, who was observed creating a disturbance in the early morning hours was justified; "[t]he police may reasonably believe themselves to be in danger when the hour is late or the location is desolate.") Thus, given the totality of the circumstances that confronted Officer Davis, we agree with the suppression court that his actions in stopping and frisking Appellant were justified. The suppression court, therefore, properly denied Appellant's suppression motion.

¶ 14 In *Commonwealth v. McDonald*, 740 A.2d 267 (Pa.Super.1999), *appeal denied*, 563 Pa. 613, 757 A.2d 930 (2000), this Court noted:

> In the present case, there was [an anonymous] "911" phone call at approximately 2:18 in the morning reporting shots fired in an area known for shootings and drug activity. While we recognize that Pennsylvania has not adopted the "man with a gun" exception to the requirement of independent corroboration, in this case the fact shots were fired created the element of imminent danger. Any delay by police in the hope of obtaining independent corroboration necessarily increased the likelihood that further action by the suspects could have resulted in injuries or even fatalities.

*McDonald*, 740 A.2d at 270 (footnote and citation omitted). Although the radio call received by Officer Davis did not include the fact that shots were fired, given the volatility of the situation he observed, like the *McDonald* panel, we find that the potential for "imminent danger" justified the officer's actions in the present case.

¶ 15 Judgment of sentence affirmed.

¶ 16 BECK, J. files a Concurring Statement.

¶ 17 CERCONE, President Judge Emeritus, files a Dissenting Opinion.

BECK, J., Concurring.

¶ 1 I join Judge Hudock's opinion. This case differs materially from *Commonwealth v. Hawkins*, 547 Pa. 652, 692 A.2d 1068 (1997) and *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997). Those cases involved reports of men with guns, accompanied by a clothing description. Our supreme court found that such tips were insufficient to warrant a stop and frisk under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) because the police officers did not have a reasonable suspicion that criminal activity was afoot. In this case however, there is additional corroborating evidence that appellant and his companion were causing a disturbance on the street that night.

¶ 2 Despite the dissent's efforts to characterize the interaction between the two men as innocuous, the transcript clearly establishes that the officer reasonably believed he had come upon a street fight. The officer described appellant as talking loudly "in the other's man's face," "pushing his way towards his face" and making gestures as if he was in an argument. Also present was a female who was "trying to get in between" the men and "push them apart." Although the officer couldn't hear what the men were saying, it is illogical to assume that he could not reasonably conclude from their actions that they were engaged in a "heated argument." That fact, coupled with the fact that the officer was alone at night and answering a report about men with guns, was clearly sufficient to authorize a *Terry* stop and frisk.

¶ 3 Unlike the dissent, I am not troubled that our holding here today will allow police to frisk citizens "discussing the weath-

er" or other ordinary topics. The conduct observed here was far different from that. The officer responded to a radio call, observed corroborating circumstances and properly conducted a *Terry* stop. He need not have waited for a gun to appear before he moved to diffuse the situation. *Hawkins* and *Jackson* simply do not control.

CERCONE, President Judge Emeritus, Dissenting.

¶ 1 Because I believe that the stop and frisk of Appellant were improper, I must respectfully dissent.

¶ 2 This case is factually similar to *Commonwealth v. Hawkins* [3], 547 Pa. 652, 692 A.2d 1068 (1997), and *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997), therefore an examination of these cases is in order. In *Hawkins*, "a Philadelphia police officer responded to a radio call that there was a man with a gun at Sydenham and York streets. The suspect was described as a black male wearing a blue cap, black jeans and a gold or brownish coat." *Hawkins*, at 655, 692 A.2d at 1070. The source of the information provided over the police radio was an anonymous tip. When the officer arrived, he observed a man, Hawkins, who fit the radio description. He stopped Hawkins and conducted a pat-down search, which revealed a handgun concealed on Hawkins' person. Hawkins appealed the denial of his suppression motion.

¶ 3 On appeal, the Supreme Court reiterated the well settled rule of law that police are permitted to subject citizens to an investigative detention, or *Terry* [4] stop, when they can point to specific and articulable facts causing them to have a reasonable suspicion that criminal activi-

ty may be afoot. If police reasonably believe that they may be in danger, they may conduct a limited pat-down search of the suspect's outer garments for weapons. Thus, before police may briefly detain a person, there must be reasonable suspicion of criminal conduct, and before police may pat-down for weapons, there must be a reasonable belief that the suspect is presently armed and dangerous. The initial question ... is whether the police officer had grounds for reasonable suspicion that criminal activity was afoot.

*Hawkins* at 655–56, 692 A.2d at 1069–70.

¶ 4 Recognizing the inherent unreliability of anonymous tips, the Supreme Court explained that

[i]f the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location. The fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct ... Something more is needed to corroborate the ... allegations ... The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before.

*Id.*, at 656, 692 A.2d at 1070. An allegation that a suspect is carrying a gun does not provide an exception to the requirement of reasonable suspicion of criminal activity. *Id.* Our Supreme Court held that

---

**3.** *Hawkins* is a plurality opinion; however, because its reasoning is adopted in *Commonwealth v. Jackson, supra,* I find it instructive and particularly relevant to this discussion.

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

the tip was anonymous and therefore unreliable, and the police had no other reason to believe that Hawkins was involved in criminal activity. No independent evidence was provided which would form the basis for reasonable suspicion to stop and frisk Hawkins, therefore the judgment of sentence was reversed.

¶ 5 In *Jackson*, "at approximately 10:23 p.m., a Philadelphia police officer received a police radio report of a man in a green jacket carrying a gun. Other than the location, no additional details were provided." *Jackson*, at 487, 698 A.2d at 572. The officer responded and observed a number of individuals at the specified location, but only Jackson fit the radio description. The officer immediately conducted a pat-down search of Jackson, during which a small box containing illegal drugs fell to the ground. Jackson appealed the trial court's denial of his suppression motion. On appeal, our Supreme Court examined the legality of the stop and frisk. The Court reiterated the reasonable suspicion standard enunciated in *Hawkins*, and reaffirmed that the "officer's suspicion must be reasonable, and based on specific, articulable facts and reasonable inferences drawn from those facts in light of the officer's experience." *Id.* at 489, 698 A.2d at 573. Again, the Court recognized the unreliability of anonymous tips and explained that they "should be treated with particular suspicion." *Id.* at 490, 698 A.2d at 573. The tip "may have been a mere prank call . . . [or] may have been based on no more than the caller's unparticularized hunch." *Id.* at 490, 698 A.2d at 574. A *Terry* stop may be based upon information provided by an anonymous tip provided it is corroborated by independent police work. *Id.* Finding the circumstances of *Jackson* indistinguishable from *Hawkins*, the Court reviewed its holding in *Hawkins*, and explained that an allegation that a black man wearing certain clothing at a certain loca-

tion was carrying a gun was insufficient to provide reasonable suspicion even when those details were corroborated by the police. Therefore, the police should have investigated further "by means not constituting a search and seizure." *Jackson*, at 493, 698 A.2d at 575. The fact that the suspect is alleged to be carrying a gun is merely another allegation and provides no reliability to the information. "There is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity." *Id.*, quoting *Hawkins, supra*, at 657, 692 A.2d at 1070. The police in *Jackson* failed to discover additional information which would establish reasonable suspicion that the suspect was involved in, or about to commit a crime, thus the stop and frisk was illegal.

¶ 6 In the instant case, the only description provided to the police officer by the anonymous tip was that there were "two black males" on the street carrying guns. This description is much more skeletal than those given to the officers in *Hawkins* and *Jackson* who were at least provided with a description of the suspect's clothing. Upon arriving at the specified location in a residential area of Philadelphia, the officer observed Appellant and another man who were, indeed, both black males and who, therefore, fit the vague description. As held in *Jackson* and *Hawkins*, the fact that a suspect resembles a description does not corroborate an allegation of criminal conduct; more information is required. Additional evidence corroborating a suspect's involvement in criminal activity is required before a stop will be justified. *Commonwealth v. Hayward*, 756 A.2d 23, 32 (Pa.Super.2000).

¶ 7 The officer testified that he saw Appellant standing close to another man "making gestures with his face." N.T. Suppression Hearing, 3/26/99, at 7. Appellant was leaning toward the other man, his

hands were at his sides and no weapon was visible. *Id.* at 8, 18. The officer could not hear what was being said between the men, but he knew there was conversation because he saw Appellant's mouth moving. *Id.* at 8–9, 18. He stated that he believed he was witnessing a fight or a disturbance. *Id.* at 9. He also observed a female trying to push between the two men. *Id.* The officer testified that he believed the female was trying to separate the men and prevent them from fighting. *Id.* at 10. The officer exited his vehicle intending to find out what was going on and to check for weapons. *Id.* at 15. He told the men to separate, which they did. *Id.* at 11. Appellant then began to walk away but was told by the officer to come back. *Id.* at 13–14. Appellant stopped, and the officer went over to him and immediately conducted a pat-down search and seized a handgun he felt in Appellant's pocket. *Id.* at 14, 17.

¶ 8 Contrary to the belief expressed in the concurring opinion, I do not characterize the interaction between the two men as "innocuous." I simply say that it might have been merely a discussion, the testimony was unclear. The men may well have been arguing, and that argument may have been heated; however, no matter how heated a verbal argument may be, it does not provide corroboration for an allegation of criminal conduct. The criminal conduct alleged by the anonymous tipster in this case was gun possession.[5] The tipster did not claim that the men were fighting or causing a disturbance, only that they had guns. The question then is whether the observance of a verbal exchange or argument provides sufficient independent evidence to corroborate an allegation of criminal activity. In other words, does the observance logically lead

to the conclusion that illegal gun possession, or any criminal activity, is afoot? The majority opines that the anonymous tip coupled with the observation of the "heated argument" justified the stop and frisk. I cannot agree. Even in its most damaging light, an examination of the totality of the circumstances reveals only that two black men were arguing loudly on the street. They were not engaged in a physical altercation, nor were weapons visible. I fail to see how this observation supports the conclusion that the two men "had been actively involved in the commission of a crime or would be actively involved in the commission of a crime in the immediate future." *Hayward* at 35. Although one's neighbors may not appreciate it, discussions and arguments on public streets do occur. Such discussions or arguments, even when loud, do not implicate criminal activity without additional evidence to corroborate such an inference. Should an observance of such a discussion or argument be deemed sufficient to justify a stop and frisk, all black men standing on the street discussing the weather or the state of the turf at Veteran's Stadium, or engaged in a debate or argument on any topic would be subject to a stop and frisk.

¶ 9 The majority further opines that the officer's observance coupled with the knowledge that someone reported armed men at that location justified the stop. However, as stated above, an allegation that a suspect is armed and at a particular location is merely an allegation and provides no reliability to the anonymous information. Indeed, as the Supreme Court in *Jackson* explained:

> The Commonwealth contends ... that the degree of danger to the police and the public from armed criminals is so great that if an anonymous caller pro-

---

**5.** Keeping in mind that gun possession in and of itself is not illegal, I presume the tipster was alleging a violation of the Uniform Firearms Act.

vides a physical description of the individual, an accurate location and an allegation that the individual is armed, a *Terry* stop is justified. That argument will not withstand constitutional scrutiny. The danger to the police and public from firearms was already factored into the balance when the requirement of reasonable suspicion was articulated in *Terry*.

*Jackson*, at 492, 698 A.2d at 575; *See also Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (United Stated Supreme Court unanimous decision holding that anonymous tip that suspect had a gun provided no means by which to test informant's credibility. The fact that the tip was correct does not suggest that the officer had reasonable suspicion, prior to frisk, to stop the suspect. A tip must be shown to be reliable in its assertion of illegality not just in its tendency to identify a specific person.)

¶ 10 Based on the Pennsylvania Supreme Court's holdings in *Hawkins* and *Jackson*, I believe that the officer lacked reasonable suspicion to stop Appellant. Further, because the stop was illegal, the subsequent frisk was also illegal.

¶ 11 However, even assuming *arguendo*, that the stop was proper, I must disagree that the officer had sufficient reason to believe that Appellant was armed and dangerous, thus justifying a pat-down search for weapons. The officer testified that he conducted the pat-down search for safety reasons. N.T., *supra*, at 14. When the prosecutor asked why he was worried about his safety, the officer replied: "If someone, somebody is aggravated, or if they have a weapon and they may have been involved in an argument—there's a lot of weapons out there, at which time I patted him down and he had a handgun in his pocket." *Id.* The fact that there are weapons "out there" does not suggest that

Appellant was armed. The fact that Appellant and the other man were engaged in what may have been an argument does not suggest that either man was armed. The discussion, though perhaps heated, was verbal and not physical. There was no evidence that a physical altercation had occurred or was about to occur. No weapons were visible and Appellant's arms were at his sides. Again, an allegation that an unidentified person is armed is merely an allegation, and not reliable. The situation did not suggest the presence of weapons.

¶ 12 The majority quotes *Commonwealth v. Zhahir*, 561 Pa. 545, 555, 751 A.2d 1153, 1158 to support its holding that the immediacy of the situation justified the search. I disagree. In *Zhahir*, the officers were confronted with a situation wherein, while investigating an allegation of narcotics trafficking, they confronted the suspect in a high crime area of Philadelphia. The suspect was acting suspiciously in that he appeared to discard something when he saw the officers and then retrieve it when he believed they had gone. The officers testified that this behavior was consistent with one dealing narcotics. When approached by the officers, the suspect turned toward them with his hand in his pocket. Believing that he might have been reaching for a weapon, the officer grabbed his hand and pocket. The Supreme Court reasoned that in light of Zhahir's suspicious behavior in response to the police presence, his presence in a high crime area, and the fact that he turned toward the officers with his hand in his pocket, the officer was justified in suspecting that Zhahir might have been retrieving a weapon. Clearly, the immediacy of that situation justified a pat-down search. In the instant case, however, Appellant was engaged in a verbal exchange, but stopped speaking and separated from the other

man when told to do so by the officer. He did not reach for a weapon, nor did he indicate that he had a weapon. He did not act in an aggressive manner which might suggest that the conversation would escalate into a physical confrontation which might involve a weapon.

¶ 13 The majority also cites *Commonwealth v. Patterson,* 405 Pa.Super. 17, 591 A.2d 1075 (1991) for the proposition that a weapons search of a defendant who was observed creating a disturbance in the early morning was justified because "the police may reasonably believe themselves to be in danger when the hour is late or the location desolate." *Id.* at 1078. *Patterson* is factually distinguishable from the instant case. In *Patterson,* the police had received numerous calls complaining about drug sales at a specific house. The police corroborated these tips by observing five persons approach and bang on the back door of the house within a two hour time span. None of the people could explain their presence at a reputed crack house between 2:30 and 4:30 a.m. Patterson was the sixth person to approach the house that morning and was observed creating a disturbance by banging on the rear door. The officers conducted a pat-down search and discovered a handgun in Patterson's waistband. As our Court held "The combination of the neighbors' reports and the suspicious heavy foot traffic during the wee hours of the morning in the dark back alley of a suspected crack house is sufficient to justify a stop." *Id.* This Court further held that the subsequent frisk was justified because it took place in the middle of the night in the back alley behind a reputed crack house, and our Court took judicial notice that drug dealers are likely to be armed and dangerous. *Id.* No such circumstances existed in the case *sub judice.* I agree that midnight may be considered late and I agree that Officer Davis was alone; however, the circumstances of this case do not give rise to the conclusion that Appellant was armed and dangerous.

¶ 14 As the United States Supreme Court said in *Terry:*

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons which whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry* at 30–31, 88 S.Ct. at 1884–85.

¶ 15 I do not believe that Officer Davis observed unusual and suspicious conduct which would lead him to believe that Appellant was armed and presently dangerous. He failed to make the reasonable inquiries mentioned in *Terry* which may have dispelled his fear for his safety. Indeed, he testified that he exited his vehicle intending to check for weapons. A reasonable answer to any question posed by the officer may have served to alleviate his fear prior to conducting the pat-down search. Police must point to specific and articulable facts indicating that the suspect is armed and dangerous, otherwise the phrase "for our own protection" becomes meaningless. *Patterson* at 1078.

¶ 16 I believe Officer Davis lacked reasonable suspicion to believe that Appellant was armed and dangerous, thus the search was illegal.

¶ 17 Accordingly, for the foregoing reasons, I respectfully dissent.